**Jerry J. KERR, Appellee,**

v.

**FIRST COMMODITY CORPORATION OF BOSTON, Appellant.**

No. 83–1488.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1983.

Decided May 9, 1984.

Rehearing and Rehearing En Banc Denied June 7, 1984.

Theodore C. Beckett, Don R. Lolli, Emmett J. McMahon, Kansas City, Mo., for appellee; Beckett & Steinkamp, Kansas City, Mo., for counsel.

Peper, Martin, Jensen, Maichel & Hetlage, Arthur L. Smith, Richard P. Sher, Mark S. Packer, St. Louis, Mo., for appellant.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

This is an appeal from a jury verdict awarding $75,000 in actual damages and $275,000 in punitive damages to plaintiff Jerry J. Kerr on a finding that defendant First Commodity Corporation of Boston was guilty of fraud in the sale to Kerr of certain commodity options. The District Court remitted the award of actual damages to $21,942, which was the price Kerr paid for the options. Kerr accepted the remittitur, and First Commodity brought this appeal.

First Commodity argues that the judgment of the trial court should be reversed because Kerr failed to meet his burden of proving actual damages and also because federal preemption prevents an award of punitive damages in a common law commodities fraud case. First Commodity further argues that the instructions to the jury regarding the measure of damages were improper, that certain evidence was erroneously admitted thus causing the jury to be prejudicially influenced in its award of punitive damages, and that the award of punitive damages was so excessive as to require either a new trial or a remittitur. As we find these and First Commodity's other contentions to be without merit, we affirm the district court's judgment.

### Facts

On October 30, 1977, First Commodity advertised in the Kansas City Star, a daily newspaper in Kansas City, Missouri. The advertisement gave several examples of how First Commodity's customers had made large profits speculating in commodity options. Kerr noticed this advertisement and, in order to acquire more information on commodity options, sent off the coupon contained in the advertisement.

Kerr is a medically retired Air Traffic Controller who has a degree in Business Administration from the University of Missouri at Kansas City and a degree in Fine Arts from the Kansas City Art Institute. He knew nothing about commodities at the time of his dealings with First Commodity. Kerr received a pamphlet entitled "Apples and Options" from First Commodity which discussed commodity option trading. Kerr testified that he only gave this pamphlet a cursory reading. Tr. at 43. Shortly after receiving the pamphlet, Kerr began receiving telephone calls from Michael Volosin, an account executive for First Commodity, in an effort to sell copper commodity options to Kerr.

Volosin claimed to be an "expert" in the field of commodity investments, and that none of his customers had ever lost money. He "guaranteed" that Kerr would make $75,000 on his initial investment.

Kerr agreed to purchase two copper option contracts. On December 12, 1977, he mailed to First Commodity a certified check for $13,942 in payment of the purchase price of the contracts. Volosin called Kerr and told him that a "signature card" would arrive in the mail the next day, that an account could not be opened without Kerr's signature, and that he should return the card immediately or else he would make less money. Kerr did so, signing the card without reading it. That card contained various disclaimers of liability and disclosures of risk intended to protect First Commodity; it did not embody the oral representations made by Volosin. Kerr received an information packet shortly after this purchase, but Volosin assured Kerr that the packets were a mere formality and that he had told Kerr everything Kerr needed to know. On December 14, 1977, Kerr purchased two more option contracts for $8,000. The first two contracts were for seven-month terms and expired on July 14, 1978. The second two options were for three-month terms and expired on March 20, 1978. P. Ex. 12–15.

Volosin told Kerr that his $21,942 investment would be worth $75,000 by January

15, 1978, and that Kerr was guaranteed to realize this amount. Volosin also told Kerr that he would send Kerr the actual contracts and that the contracts could be exchanged for cash at any bank or with any stockbroker.

First Commodity never sent the contracts to Kerr. Instead, he received only "confirmations of purchase," which indicated the amount of copper involved and the price paid. The confirmations on the first two contracts also indicated that the entire price of the option was consumed by "brokerage charges." The president of First Commodity testified that "brokerage charges" meant the same as "commission" —thus creating a 100% commission for First Commodity. The second two confirmations divided the purchase price into three categories: $82 for "clearing broker's fees," $1,370 for "grantor's premium/hedge cost," and $2,548 for "U.S. brokerage charges." P. Ex. 14, 15. According to First Commodity, the "clearing broker's fee" is the amount paid to the actual broker who purchases the option on the exchange floor. The "grantor's premium/hedge cost" (or option premium) is the actual cost of the option. The "U.S. brokerage charges" are First Commodity's internal costs, expense and profit. P. Ex. 2 at 5. Thus, on the second set of contracts, 34.25% of what Kerr spent paid for the option while 65.75% paid First Commodity's fee and the clearing broker's fee.

At trial, evidence was presented showing that the price of copper on the London Metals Exchange fluctuated from a high of 780 pounds sterling to a low of 685 pounds sterling per metric ton during the period from December 14, 1977 to July 28, 1978. Each of Kerr's first two option contracts gave him the right to purchase 25 metric tons of copper at 725 pounds sterling per metric ton for a period of seven months. The second set of options each gave him the right to purchase 25 tons of copper at 695.5 pounds sterling per metric ton for a period of three months. Although the exchange rate between pounds sterling and dollars appeared on the confirmations of purchase received by Kerr, no evidence was presented on any exchange rate changes during the period of the options. Likewise, no evidence was presented indicating the minimum increase in the price of copper above the exercise price needed for Kerr to realize a profit.

After the purchases, Volosin called Kerr and stated that he would call Kerr every week to inform him of the status of his investment. Not having received his contracts, Kerr attempted to contact Volosin. Kerr kept asking when his contracts would arrive, and Volosin kept stating that they were on the way. Volosin then became impossible to reach until after New Year's Day 1978. Kerr eventually contacted a man named Alex Fisher at First Commodity. Fisher told Kerr that he had no chance of making any money from the options he had purchased. Kerr had one more conversation with Volosin the first week in January. Volosin now told him that it would take more time—until January 31, 1978—to realize his profits, and again guaranteed him a $75,000 return on his investment. At this point, Kerr felt certain that something was unusual about the entire transaction, and he contacted the Commodities Futures Trading Commission. He then contacted an attorney, which resulted in the filing of this lawsuit alleging common law fraud. The suit was filed on February 24, 1978, prior to the expiration of any of the options. Plaintiff did not exercise any of the options, and they expired in accordance with their terms.

Subject matter jurisdiction is based on diversity of citizenship. The parties agree that the governing substantive law is the law of Missouri.

### Issues

#### I. Proof of Actual Damages

■ First Commodity asserts that Kerr failed to prove any actual damages from the transaction. First Commodity contends that Kerr paid for the right to participate in the upward movement of the price of a certain amount of copper for a given period of time, and that this is what he received.

In so contending, First Commodity accurately describes the substance of a commodities option contract as understood by a properly informed investor. Kerr, however, was not a knowledgeable investor in contracts of this kind, and Volosin undoubtedly was aware of Kerr's ignorance in this regard. There is no evidence that Volosin made any attempt to educate Kerr as to option contracts and the investment risks they carry. Instead, Volosin made false promises and representations that Kerr believed and relied upon. In view of Volosin's promises and the nature of the fraud he practiced on Kerr, we hold that Kerr presented sufficient evidence for the jury to conclude that he suffered actual damages.

Kerr testified that he never received anything he was promised. Kerr was told he would receive the actual option contracts. There is evidence that Kerr repeatedly contacted First Commodity attempting to ascertain the status of his investment and to get First Commodity to send the option contracts to him, yet the contracts never were received by Kerr. Volosin told Kerr that he would call Kerr weekly to advise him on the status of his investment. Instead, Volosin became very difficult to reach, and others at First Commodity told Kerr that Volosin had been overly optimistic in his assurances to Kerr of huge profits. Volosin promised Kerr that his investment was risk free and would produce a gross return of $75,000 by January 15, 1978. Instead, when Kerr talked to Volosin one last time during the second week in January, Volosin admitted no profits would be realized by January 15 and made a new promise that the profits would be forthcoming by January 31, 1978. January 31 passed and Kerr still had neither possession of the contracts nor profits. After the filing of this lawsuit on February 24, 1978, no more promises, services, or materials were received by Kerr from First Commodity. From this series of events, the jury clearly had sufficient evidence to conclude that Kerr received nothing Volosin had promised him and that having invested substantial funds on the strength of Volosin's fraudulent statements he therefore had sustained actual damages.

## II. *Measure of Actual Damages*

■ First Commodity contends that the instruction given by the trial court based on Missouri Approved Jury Instruction (M.A.I.) 4.01 was inappropriate. M.A.I. 4.01 reads, in full:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained [and is reasonably certain to sustain in the future] as a direct result of the occurrence mentioned in the evidence.

First Commodity argues that the appropriate measure of damages in this case is the "benefit of the bargain rule" as embodied in M.A.I. 4.03. This instruction measures the plaintiff's loss as the difference between the represented value of the property and the actual value of the property. Under Missouri law, this is ordinarily the correct measure of damages in a case of fraud. However, Missouri permits the use of other measures of damages where the peculiar circumstances of the fraud make the benefit of the bargain rule an inadequate measure of damages, *Central Microfilm Service Corp. v. Basic/Four Corp.*, 688 F.2d 1206, 1220 (8th Cir.1982) (quoting *Schroeder v. Zykan*, 255 S.W.2d 105, 110 (Mo.Ct.App.1953)), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983), or where nothing of value is received from the transaction, *Salmon v. Brookshire*, 301 S.W.2d 48, 54 (Mo.Ct.App.1957).

■ We agree with the District Court that because of the peculiar circumstances of this case the benefit of the bargain rule was not the appropriate measure of damages. First, the record is devoid of any evidence that the options in question had an ascertainable market value or that there was any objective method by which their "actual value" could have been established. Second, assuming that the options initially had some value that Kerr might have real-

ized, the actions of First Commodity caused Kerr to continue his course of dealing with defendant, and delayed his discovery of the fraud. As the District Court explained in overruling First Commodity's post-trial motions objecting to the instructions on actual damages:

> The "bargain theory" was not appropriate in this case because the passage of time [after the purchase prevented the] plaintiff [from] reasonably . . . taking action to avoid losses based on defendant's misrepresentations. Even if a sophisticated trader might have been willing to pay good money on a get-rich gamble, so that a theoretical "market value" could be assigned to the chance, the testimony is that plaintiff's money was lost before he knew what had happened.

D.R. at 190–91 (Citation omitted). Thus we believe the District Court was correct in giving to the jury instructions based on M.A.I. 4.01 rather than on M.A.I. 4.03. And even assuming *arguendo* that error could be found in the instructions, any such error has been rendered harmless by the District Court's remittitur of the jury's award of actual damages. *Cf. Beaty v. N.W. Electric Power Cooperative, Inc.,* 312 S.W.2d 369, 372–3 (Mo.Ct.App.1958) (in a property damage action where farmer's crop for 1953 was destroyed, and the judge erroneously instructed jury that it could award damages for 1954 crops as well, error in instructions held not prejudicial where judge granted remittitur).

### III. *Similar Occurrence Evidence*

#### A. The 1976 Consent Decree

■ First Commodity challenges the district court's admission of the 1976 consent decree introduced by Kerr. In this consent decree, *Commodity Futures Trading Commission v. First Commodity Corporation of Boston,* No. 76–4051–M (D.Mass. Nov. 11, 1976), First Commodity agreed to cease and desist from a variety of deceptive practices, many of which are identical to the practices used by First Commodity in defrauding Kerr. Tr. at 262–69. The consent decree was admitted solely for the purpose of demonstrating First Commodity's knowledge and intent to commit the fraud insofar as such knowledge and intent are relevant to the issue of punitive damages. *See New England Enterprises, Inc. v. United States,* 400 F.2d 58, 70 (1st Cir. 1968). The jury was instructed adequately as to the limited purpose for which the evidence was admitted. Tr. at 269–70. Under Federal Rule of Evidence 404(b), the trial court has the duty to balance the probative force of the evidence against any possible prejudicial effect it might have on the jury. After both parties argued the consent decree's admissibility, the trial court weighed the probative value of this evidence against its possible prejudicial effect in the manner required by Rule 404(b). We cannot say that the trial court abused its discretion in admitting the 1976 consent decree.

#### B. Testimony of Other First Commodity Customers

■ First Commodity contends that the admission of the testimony of several witnesses who testified to prior similar activities by First Commodity was so prejudicial that it violated Rule 404(b) of the Federal Rules of Evidence, thus constituting an abuse of discretion by the district court and compelling reversal. We do not agree.

Rule 404(b) provides that evidence of other crimes or bad acts of the defendant may be admitted to show absence of mistake, identity, intent, and common plan or scheme. On the issue of punitive damages, the testimony of other customers about representations made by First Commodity through its agents was properly introduced to show First Commodity's absence of mistake and its intent to defraud the public. *See Colonial Refrigerated Transportation, Inc. v. Mitchell,* 403 F.2d 541 (5th Cir.1968) (judgment against defendant for prior similar fraud committed by defendant's employees held admissible in suit against defendant for limited purpose of proving motive, knowledge, or intent). Inasmuch as proper limiting instructions

were given to the jury, First Commodity suffered no unfair prejudice from the admission of this testimony.[1] We hold that the district court did not abuse its discretion in admitting the testimony of other First Commodity customers.[2]

## IV. Impeachment Evidence: The 1980 Consent Decree

■ A second consent decree was entered against First Commodity in 1980 which again required First Commodity to cease and desist from the same deceptive practices covered by the 1976 consent decree, and also required payment of a $600,-000 civil penalty for First Commodity's failure to comply with the 1976 consent decree. Initially determined to be irrelevant to the events of 1977–78, since it was entered after the events in question, the trial court permitted its use for purposes of impeaching the testimony of Hendrick Maas, Vice President of Operations of First

Commodity. Maas testified that one of his duties at First Commodity was to help ensure compliance with the 1976 consent decree. From his testimony the jury easily could have inferred that all the problems identified in the 1976 consent decree had been solved. The court permitted Kerr's counsel to cross-examine Maas about the 1980 consent decree in order to counterbalance the effect of this testimony. The trial court heard First Commodity's objections to the use of the 1980 consent decree outside the hearing of the jury. The court balanced the probative value of the 1980 decree against its prejudicial effect and allowed its use for purposes of impeachment. Cautionary instructions were given to prevent the jury from considering the 1980 decree in determining the ultimate question of liability. We hold that the district court did not abuse its discretion by permitting Kerr to use the 1980 consent decree for impeachment purposes.

1. The following instruction, given by the District Court after the testimony of Michael Collins, is typical of the instructions given for all of the similar occurrence evidence introduced at trial:

    This is another cautionary instruction similar to the one I gave about the 1976 Consent Decree. The testimony of Michael Collins that an act was done at one time or on one occasion is not evidence or proof whatsoever that a similar act was done at another time, or on another occasion. That is to say, evidence that some other agent of First Commodity Corporation of Boston may have committed an act of like nature may not be considered by the jury in determining whether Mr. Volosin of First Commodity Corporation of Boston may have committed an act of like nature ... [as is here] alleged by Mr. Kerr. You should focus your attention on Mr. Kerr's case. His case is the one being tried this week. And his case is the one you must decide. Evidence of an alleged act of like nature may not be considered for any purpose whatsoever unless you find there is other evidence standing alone which establishes by the evidence that Mr. Volosin of First Commodity made the particular misstatement alleged by Mr. Kerr to have been made. If the jury should find from the other evidence that Mr. Volosin of First Commodity made the particular mis-statement here complained of, and alleged by Mr. Kerr to have been made, then the jury may consider evidence as to another alleged act of like nature in determining the state of mind, intent, or plan with which the agent of First Commodity made the statement to this

    plaintiff, Mr. Kerr, and where proof of another alleged act of a like nature are [sic] established, the jury may, but is not obligated to draw the inference and find that in doing the act here complained of, and alleged by the plaintiff, Mr. Kerr, First Commodity did so with a plan or intent to mislead, and not because of mistake or other innocent reason. The jury may feel the testimony is of no importance and disregard it entirely. But it has been admitted only because of its potential relevance on the issue of plan or intent to mislead, and not for any other purpose.
    Tr. at 311–13.

2. First Commodity cites United States v. Eckmann, 656 F.2d 308 (8th Cir.1981) for the proposition that this evidence should have been excluded. First Commodity misconstrues and misapplies the holding of this case. Eckmann was a criminal case which resulted in the conviction of the defendant for receiving stolen property. In that case the government introduced evidence showing that several other prospective purchasers of the stolen property made a decision not to purchase the property. The Court held that the evidence was inadmissible against Eckmann because it attempted to establish a "reasonable man standard" against which the jury might inappropriately compare Eckmann's conduct. Id. at 312–13. In the instant case, however, the evidence of similar misrepresentations was not introduced to establish a standard of conduct, but to show First Commodity's intent to defraud.

## V. *The Award of Punitive Damages*

### A. Preemption

First Commodity asserts that the court lacked the power to permit an award of punitive damages in a common law fraud action because the power to make such an award has been preempted by the Commodities Exchange Act (Act), 7 U.S.C. §§ 1–24. First Commodity cites no case directly supporting this proposition. Instead it relies on the decision of the Tenth Circuit in *Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir.1981), *rev'd*, —— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The instant case was briefed and argued prior to the Supreme Court's reversal of the Tenth Circuit's decision. In *Silkwood,* the Supreme Court held that an award of punitive damages for injuries caused by the escape of plutonium from a nuclear facility is not preempted by federal regulation of nuclear facilities. *Silkwood* thus does nothing to advance First Commodity's cause.

■■■ The Act establishes an ambitious scheme for the regulation of commodities trading. *See* 7 U.S.C. §§ 1–24. The establishment of a wide-ranging scheme of federal regulation, however, does not result in the abolition of common law rights unless Congress plainly intended to abolish them or unless their continued existence would render the regulatory scheme ineffective. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 298–300, 96 S.Ct. 1978, 1984–1985, 48 L.Ed.2d 643 (1975). Nothing in the Act deals expressly with the preemption question. Moreover, the continued existence of common law fraud actions permitting punitive damage awards does not conflict with the regulatory scheme established by the Act. Congress recognized this by including a savings clause in the Act which reads: "[n]othing in this section shall supersede or limit the jurisdiction conferred on Courts of the United States or any State." 7 U.S.C. § 2. Moreover, by specifically making the arbitration and reparation procedures of the Act voluntary, Congress further evidenced its intention that the remedies under the Act should supplement rather than replace common law remedies. *See* 7 U.S.C. §§ 7a(11), 18. The continuing availability under state law of punitive damages for commodities fraud was expressly recognized in *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207–08 (9th Cir.1982). We agree with the Ninth Circuit in holding that the Act does not preempt punitive damage awards for common law fraud in commodities transactions.

### B. Amount of Punitive Damages Award

■■■ First Commodity claims that even in the absence of preemption the award of $275,000 in punitive damages is excessive. It asserts that since remittitur was ordered with respect to actual damages, the trial court should have remitted the award of punitive damages. First Commodity relies on *Ogilvie v. Fotomat Corp.*, 641 F.2d 581 (8th Cir.1981). In *Ogilvie* the jury returned a verdict awarding separate actual and punitive damage awards on each of ten counts of fraud. Throughout each of the ten counts, the jury consistently used a multiple of four times actual damages to determine the amount of punitive damages awarded on each count. The trial judge remitted the actual damage awards, but not the punitive damage awards. This resulted in wide variations in the ratios between the punitive damage awards and the actual damage awards on the various counts, such ratios ranging from a low of 8.1 to 1 to a high of 52.4 to 1 after the remittitur. Given the clear evidence of a consistent jury formula, this Court held that the punitive damages must be remitted to conform to the intent of the jury. The Court stated:

We recognize that appellate courts are reluctant to reduce a punitive damage award because such a decision "rests peculiarly in the discretion of the jury." We believe, however, that when the jury clearly assesses punitive damages as a multiple of actual damages, the court, by proportionally reducing punitive damages, will more likely effect the original judgment of the jury, while avoiding excessive damage awards.

*Id.* at 587 (Citation omitted). *Ogilvie* is readily distinguishable because in the present case the jury returned a verdict on only one count of fraud and there is no clear evidence that they intended or used a specific multiple of actual damages in assessing punitive damages. The standard for reviewing the trial court's decision concerning remittitur is whether the trial court abused its discretion. *Ouachita National Bank v. Tosco Corp.,* 716 F.2d 485, 488 (8th Cir.1983). We cannot say that the trial court abused its discretion in declining to remit the award of punitive damages.

First Commodity also asserts that the punitive damage award was the product of bias and prejudice. This argument largely rests on appellant's assertion that the similar occurrence evidence discussed *supra* should have been excluded and on the fact that the jury's award of actual damages was remitted. First Commodity contends that the erroneous admission of the similar occurrence evidence inflamed the jury and caused them to render an excessive award. Our holding that such evidence properly was admitted and properly could have been considered by the jury on the issue of punitive damages is a complete answer to this argument.

■■■■■ First Commodity further argues that, since the ratio of the punitive damages award to the remitted actual damages award is approximately twelve-to-one, the punitive damages award is therefore "monstrous and shocking" as a matter of law. Missouri case law does not support this argument. First, Missouri courts have held that even a nominal damage award may provide a sufficient basis for an award of punitive damages. *Coonis v. Rogers,* 429 S.W.2d 709, 716 (Mo.1968). Moreover, in one Missouri case a punitive-to-actual-damage award ratio of greater than forty-to-one was approved. *Price v. Ford Motor Credit Co.,* 530 S.W.2d 249 (Mo.Ct.App. 1975). The purpose of punitive damages is fundamentally different from the purpose of compensatory damages; the former, as their name implies, serve to punish the defendant and to deter both the defendant

and others from engaging in similar conduct in the future. The degree of malice and the financial wealth of the defendant both are relevant in determining the proper amount of punitive damages. *Armstrong v. Republic Realty Mortgage Corp.,* 631 F.2d 1344, 1351-2 (8th Cir.1980) (applying Missouri law). Missouri courts require a nexus between the wrong committed by the defendant and the amount of punitive damages, not between the amount of actual damages awarded and the amount of punitive damages. *Beggs v. Universal C.I.T. Corp.,* 409 S.W.2d 719, 724 (Mo.1966). The jury has wide discretion in determining the amount of punitive damages, and that determination is not to be disturbed unless it is the product of bias or prejudice or is otherwise an abuse of discretion. *Id.* We cannot say that the jury abused its discretion in awarding $275,000 in punitive damages in the instant case.

We have reviewed carefully the record and the briefs of the parties, and have heard oral argument in this case. Having considered First Commodity's other arguments and finding them to be without merit, the judgment of the district court is affirmed.