David T. JORDAN, Appellee,

v.

**CLAYTON BROKERAGE COMPANY OF ST. LOUIS, INC., Appellant.**

No. 87–1312.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1988.

Decided Oct. 17, 1988.

Rehearing and Rehearing En Banc Denied Dec. 8, 1988.

John W. Cowden, Kansas City, Mo., for appellant.

William C. Partin, Kansas City, Mo., for appellee.

Before HEANEY and WOLLMAN, Circuit Judges, and ROSS, Senior Circuit Judge.

HEANEY, Circuit Judge.

Clayton Brokerage Co. of St. Louis, Inc. (Clayton) appeals from the district court's judgment entered in accordance with a jury verdict awarding David T. Jordan compensatory damages of $7,923.50 and punitive damages of $400,000.00. We affirm.

## I. BACKGROUND

On June 30, 1980, Jordan established a commodities futures trading account with Clayton. Prior to that time, Jordan had traded in commodities futures with several other firms and had lost money. Jordan's account with Clayton remained dormant until December of 1980 when he placed a trade and lost $677.50. Six weeks later, Jordan called Martin Rachlin, a Clayton broker and the branch manager of Clayton's Kansas City office. After some discussion, Jordan gave discretionary control over the account to Rachlin. The account, however, was never formally listed as discretionary in Clayton's records.

Rachlin began placing trades in Jordan's account in earnest on February 3, 1981. By March 13, 1981, Rachlin had placed a total of 94 trades in the account and had lost $7,923.50. The trades generated approximately $5,292.00 in commissions. While Rachlin was placing trades in the account, Jordan questioned him about the short term trading strategy he appeared to be following and the losses incurred in the account. Rachlin assured Jordan that he was an experienced trader and that some short term trading was necessary to take advantage of market trends.

When the equity in Jordan's account was depleted, Jordan received a margin call and notice that no further trading could take place in the account until the call was met. Jordan then contacted Rachlin to complain. Rachlin falsely responded that the notice was the result of a computer error. Rachlin then transferred into Jordan's account a number of profitable trades he originally placed in other accounts in order to regain Jordan's confidence, bring the account out of deficit status, and further trade the account. Jordan was unaware of this action because the confirmation slips sent to him did not indicate that the orders had been switched into his account.[1] Eventually, Jordan closed the account and brought an action in federal district court alleging misrepresentation in violation of the Commodities Exchange Act, 7 U.S.C. § 6(b), and breach of fiduciary duty under Missouri common law.

At trial, Jordan proceeded on the theory that his losses were a small portion of those caused by a larger "plan" pursued by Rachlin and encouraged by Clayton's failure to take measures against Rachlin despite its knowledge of his actions. Pursu-

---

1. The evidence at trial also indicated that on several occasions Rachlin switched into other accounts profitable trades originally placed in Jordan's account. Overall, however, Jordan's account posted a small net gain as a result of the order switching.

ant to this plan, Rachlin gained discretionary control over an account and failed to record that control as required by company policy. Rachlin then excessively traded the account, generating large commissions for himself and Clayton, while establishing no coherent trading strategy. Rachlin also engaged in order switching. Rachlin switched some profitable trades into accounts he opened and controlled under fictitious names. More commonly, however, Rachlin switched orders in an effort to retain the confidence of investors, often bringing their accounts out of a deficit status in order to further trade them and generate additional commissions. If the customer complained, Rachlin misrepresented his skill and assured the investor that future trading would be profitable. Finally, if an investor complained directly to other Clayton employees, the investor was informed that his or her account was not listed discretionary and that, therefore, the losses were the investor's responsibility.[2]

The jury found for Jordan on both claims and awarded him $7,923.50 in compensatory damages and $400,000.00 in punitive damages. Clayton then brought a motion seeking a reduction of the punitive damages award or, in the alternative, a new trial. The district court denied the motion. Clayton appeals on two grounds: (1) that the punitive damages award is grossly excessive in relation to the actual damages, and (2) that the punitive damages award is the result of prejudice caused by improper admission of testimony detailing the larger plan.

## II. EXCESSIVENESS

■ Clayton argues that the punitive damages are plainly excessive. In particular, it cites the 50–1 ratio of punitive to actual damages as evidence of gross excessiveness. Clayton contends that under Missouri law, punitive damages in the range of 2–1 to 4–1 are reasonable. Jordan

responds that the award is supported by the degree of malice shown and by Clayton's financial condition. Moreover, Jordan argues that the award is consistent with the punitive awards affirmed in *Kerr v. First Commodity*, 735 F.2d 281, 289 (8th Cir.1984) (actual damages of $21,942.00 and punitive damages of $275,000.00) and *Wegerer v. First Commodity Corp.*, 744 F.2d 719 (10th Cir.1984) (actual damages of $10,-775.00 and punitive damages of $250,-000.00).

We find *Kerr* instructive on this point. *Kerr* involved an action for commodities trading fraud against a commodities trading firm, brought pursuant to both federal law and Missouri state law. On appeal, the firm challenged the punitive award of $275,000.00 as excessive in light of the trial court's remittitur of actual damages from $75,000.00 to $21,942.00. This Court upheld the punitive award, stating:

> The degree of malice and the financial wealth of the defendant both are relevant in determining the proper amount of punitive damages. Missouri courts require a nexus between the wrong committed by the defendant and the amount of punitive damages, not between the amount of actual damages awarded and the amount of punitive damages. The jury has wide discretion in determining the amount of punitive damages, and that determination is not to be disturbed unless it is the product of bias or prejudice or is otherwise an abuse of discretion.

735 F.2d at 289 (citations omitted).

Thus, the fact that the punitive damages award in this case is significantly greater than the actual damages award does not, in itself, require reduction of the punitive damages. Rather, we must examine whether there is a sufficient nexus between the wrong committed by Clayton and the amount of punitive damages. *See Wheeler v. Community Federal Savings*

---

**2.** Prior to trial, Clayton brought a motion in limine to exclude much of the "plan" evidence Jordan intended to introduce. After extensive briefing on the issue and a half day of oral argument, the district court substantially overruled Clayton's motion to exclude the evidence.

The court did, however, limit evidence concerning four other Clayton customers, each of whom claimed to be victims of the larger plan, by prohibiting detailed testimony about the customers' account statements and trading transactions.

*and Loan Assn.,* 702 S.W.2d 83, 88 (Mo.Ct. App.1986) (upholding actual damage award of $500.00 and punitive award of $100,-000.00 stating that "[t]he general doctrine is that punitive damages awarded must bear some relation to the injury inflicted and the cause thereof, *though they need not bear any relation to the damages allowed by way of compensation.*").

In this regard, the district court stated in its Memorandum and Order:

[T]he jury could have concluded reasonably that [Clayton] placed Martin Rachlin in a position where [Jordan] was encouraged to place his confidence in Rachlin; that Jordan was encouraged to place his confidence in Rachlin; that Rachlin used that position to violate the trust and confidence * * * placed in him resulting in substantial financial harm to [Jordan] and substantial financial gain to Rachlin and [Clayton]; that [Clayton] failed to supervise in any meaningful way Rachlin's handling of [Jordan's] account; that even when complaints about Rachlin were received, [Clayton] failed to investigate adequately; that [Clayton] ignored information it had that Rachlin was violating [its] regulations; and that because of [Clayton's] substantial net worth, a punitive damage award of $400,000 was necessary to deter similar behavior by [Clayton] in the future.

District Court Memorandum and Order at 6–7.

We have independently reviewed the evidence presented at trial concerning Clayton's conduct and affirm the district court's finding that the evidence fully supports the punitive damages award. For example, we note that James W. Hanson, a broker with Clayton, testified that in 1979 and 1980, while he was branch manager of Clayton's Kansas City office, he investigated customer allegations that Rachlin engaged in discretionary and excessive trading in accounts listed as nondiscretionary. As a result of the investigation, Hanson concluded that Rachlin "had been making unauthorized trades in [two] customer accounts." Transcript at 296. Moreover, he testified that he informed his superiors in Clayton's home office in St. Louis of his conclusion. Despite this information, Clayton relieved Hanson from his position as branch manager and promoted Rachlin to that position. Transcript at 183.

With respect to excessive trading, Leslie Jordan, an expert retained by Jordan, testified that of the 32 days on which Rachlin could have traded Jordan's account, the account was actually traded on 24 days. In total, 84 trades were executed, generating an average daily commission of $165.39.[3]

**3.** The expert also testified that 70% of the trades in Jordan's account were "day trades." The expert stated that such trades are indicative of discretionary control of the account by the broker due to the extensive communication that would be required for the customer to engage in such trading. In addition, the expert testified:

Q. What is the basic interest or objective of a person who's a speculator in the futures market?
A. Hope to have trading profits that exceed your cost of doing business, which is your commissions.
Q. Now, taking that interest or that objective and bearing it in mind, could the trading that you described here in Mr. Jordan's account in your testimony today meet or satisfy that objective?
A. I think it is heavily weighed (sic) against that possibility. Part—because it was predominantly day trades, that means the only profit that could be made was how much the market moved in that given day.
The market moves in fixed limits. It can't go from $400 an ounce to $500 an ounce in a

day. It can move from $400 an ounce to [$]410. If you are right, and bought early in the day when it was low and sold high, it still backs out how much you can possibly make in a given day. It must move more than the cost of doing commissions * * *.
The problem with trying to make a profit with day trading is, that you got things stacked against you. First you have to overcome the commission cost, and then you have to have enough price move within the given time period to compensate for that and still give you a net overall profit.
It's a technique that rarely produces a profit in speculative customer accounts that are paying full-commission rates.
Q. Would you say that the trading in Mr. Jordan's account that has already been described was consistent with or was contrary to the basic interest of making a profit?
A. I think having heavy concentration in day trades in a small speculative account, paying full commission, is a doomed strategy. The customer can't come out ahead. There are too many odds against him.

The expert testified that in order to simply pay the commissions the account would have had to generate profits of more than 182 percent per month. The record also contains testimony that Clayton normally received at least a portion of the trading commissions. Transcript at 408.

Concerning order switching, Martha La-Quey testified that shortly after she was fired by Rachlin, she met with Ralph E. Bradac, an employee with Clayton's compliance department in St. Louis, and informed him that Rachlin was engaged in order switching.[4] Transcript at 405. Bradac's deposition, parts of which were read into the record at trial, indicates that he reported the conversation to Clarence Delbridge, then head of Clayton's compliance department. Bradac deposition at 127. In addition, the record establishes that even if Clayton had not been explicitly informed of the order switching, it had available to it computerized information from which it should reasonably have detected the order switching scheme. Delbridge deposition at 74–80; transcript at 300–05. Thus, the record contains ample evidence from which the jury could have concluded that Clayton knew Rachlin was engaged in the order switching scheme.

In sum, the record fully supports the district court's finding that Clayton's acts and omissions are sufficiently related to the injury suffered by Jordan to justify the punitive damages award.

## III. PREJUDICE

■ Clayton also argues that the punitive damages award resulted from prejudice caused by improper admission of evidence concerning the larger plan. Specifically, it contends that the evidence was improperly admitted because, under Federal Rules of Evidence 403 and 404, its probative value was far outweighed by its prejudicial and confusing effect on the jury. In this regard, Clayton points out that the

bulk of the contested evidence concerns events that occurred prior to the trading activity in Jordan's account which are irrelevant to Jordan's claims. Clayton also argues that the single limiting instruction given the jury concerning the plan evidence was insufficient to overcome the prejudice caused by its admission.

Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court has had occasion to apply Rule 404(b) in a situation very similar to the instant case. In *Kerr v. First Commodity Corporation of Boston*, 735 F.2d 281, 286–88 (8th Cir.1984), we considered a challenge to the trial court's admission of testimony of customers who were not parties to an action against a commodities futures trader. The customers testified that the trader defrauded them in a manner similar to that alleged by the plaintiff.[5] We affirmed the district court's admission of the testimony, finding that the evidence was properly admitted on the issue of punitive damages to show knowledge, intent and absence of mistake on the part of the trader. *Id.; see also Wegerer v. First Commodity Corporation of Boston*, 744 F.2d 719, 724 (10th Cir.1984).

Although admission of "other acts" evidence carries with it the potential to confuse the ultimate issues to be determined by the jury and to unfairly prejudice a party, we note that under Rule 404(b) the trial court "has the duty to balance the probative force of the evidence against any possible prejudicial effect it might have on the jury." *Kerr*, 735 F.2d at 286. Moreover, the balance struck by the trial court

Transcript at 758–59.

4. In contrast, Bradac's deposition reflects that the meeting did not occur until March 17, 1981, some four days after the last trade in Jordan's account and one day after Rachlin was fired.

5. In addition, we also considered a challenge to the district court's admission of two prior consent decrees entered against the trader.

will be overturned on review only on a finding of abuse of discretion.

Our review of the record indicates that the district court carefully considered the evidence concerning the larger plan and admitted it to show knowledge, intent and absence of mistake on the part of Clayton. The record also discloses that the trial court limited in some respects detailed testimony concerning the larger plan. Accordingly, we hold that the trial court did not abuse its discretion in striking the balance that it did.

■ In addition, the record reflects that early in the trial, Clayton brought up the subject of a cautionary instruction. In response, the court requested Clayton to prepare such an instruction and offered to hear argument on the content of the instruction and when it should be given. From Clayton's subsequent silence on the issue, we can only conclude that it decided, as a tactical matter, to request the court to give the cautionary instruction only with the other instructions at the close of the case.[6] In any event, we cannot say that the trial court's failure to give, sua sponte, a cautionary instruction during the course of the proceedings constituted an abuse of discretion.

## IV. CONSTITUTIONAL CHALLENGE

Finally, Clayton argues that the punitive damages award violates the due process and equal protection clauses of the United States Constitution. Specifically, it contends that jury instruction number four violated its due process rights because it set forth a preponderance of the evidence standard as the burden of proof for awarding punitive damages. Clayton objected to the instruction at trial and challenges the instruction on appeal on the ground that the punitive nature of the award requires proof beyond a reasonable doubt. In addition, Clayton contends that admission of evidence as to its net worth violated the equal protection clause because the evidence irrationally implies it would be more appropriate to punish Clayton than another defendant under similar circumstances who had a lesser net worth.

In essence, we understand Clayton's contentions to be grounded on *Bankers Life and Casualty Co. v. Crenshaw*, — U.S. ——, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). At the time Clayton filed its brief in this case, the Supreme Court had noted probable jurisdiction but had not yet decided *Bankers Life*.

In *Bankers Life*, the petitioner insurance company sought to challenge a jury verdict awarding the appellee 1.6 million dollars in punitive damages. The insurance company contended that the award violated the Eighth Amendment's prohibition of excessive fines. In addition, it claimed that the award violated the due process and the contract clauses. The Supreme Court, however, declined to reach the issues, concluding that they were not raised and passed upon in the prior state court pro-

---

**6.** The record reflects the following exchange concerning the cautionary instruction:

[Counsel for Clayton]: You advised us earlier, I believe it was in connection with the arguments on the motion in limine, that you would give to the jury a cautionary instruction dealing with the evidence of activities relating to the other customers, customers other than Mr. Jordan.

We've looked at that Eighth Circuit case that has, I believe in the footnote, a cautionary instruction that was given in that case. If you wish, we would be willing to draft a proposed cautionary instruction for your review, or I guess we are asking whether you have drafted such an instruction, or just what we should do on that.

I think we are getting more and more into that type of evidence. We assumed we would not ask for that until right before the other customers started coming on the stand. But we are already getting into evidence about other customers.

I think Ms. LaQuey will undoubtedly testify about other customer's accounts, and so it may be that we would be requesting that fairly quickly.

The Court: What I propose you do * * * is prepare the form of instruction that you wish that I give, show that to [plaintiff's counsel], let them look at it, and then if there is some disagreement about either the instruction or when it should be given, we can take it up at one of our numerous times away from the jury.

Transcript at 333–34.

ceedings. —— U.S. at ——, 108 S.Ct. at 1650.

Initially, we note that the equal protection claim raised by Clayton was not raised by the appellant in *Bankers Life*. Moreover, although the appellant in *Bankers Life* claimed that the punitive award violated the due process clause, the Supreme Court characterized the chief issue raised in the case as "whether the Eighth Amendment's Excessive Fines Clause serves to limit punitive damages in state civil cases." *Id.* Thus, it is clear that the constitutional challenge to the punitive damages awarded in this case is very different from the challenge the petitioners sought to raise in *Bankers Life*.

More importantly, however, Clayton cites no case other than *Bankers Life* in support of its constitutional claims. Contrary to Clayton's due process claim, punitive damages are civil in nature and are therefore not required by the Constitution to be subject to proof beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970). (Harlan J. concurring).

Similarly, Clayton's equal protection challenge is without merit. Clayton argues that admission of evidence of its net worth improperly suggested it would be more appropriate to punish Clayton than to punish a defendant with a lesser net worth. Yet, the evidence was not admitted on the issue of whether to impose punitive damages, nor was the jury instructed to consider such evidence in that determination. Rather, the jury was instructed to award punitive damages only if it found in favor of Jordan on the compensatory claim and if it found Clayton's conduct was malicious. *See* Jury Instruction No. 12. Thus, admission of the evidence did not violate Clayton's rights under the equal protection clause.

Accordingly, we affirm the judgment of the district court.

ROSS, Senior Circuit Judge, dissenting.

I respectfully dissent from the opinion of the panel majority and instead would re-verse and remand the case to the district court with directions to order a remittitur of at least $300,000 of the $400,000 punitive damages award. A remittitur is appropriate in this case for at least two reasons. First, the record discloses that Clayton Brokerage Services Company (Clayton) was at most negligent in failing to supervise and investigate Martin Rachlin's activities. The degree of malice exhibited by Clayton does not justify the severity of the punitive damages levied against it.

Second, at a fifty to one ratio, the punitive damages award is so grossly excessive in relation to the actual damages that the award represents a plain injustice. The punitive damage award imposed in this case does not exhibit the requisite correlation to the injury inflicted and the cause thereof. *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 (8th Cir.1987).

Accordingly, I dissent from the majority opinion to the extent that it fails to find that the punitive damages award of $400,-000 is excessive as a matter of law.