(643 P.2d 1115)
No. 52,877

PHILLIP W. STANFIELD, *Appellee/Cross-Appellant,* v. OSBORNE INDUSTRIES, INC., STANLEY M. THIBAULT, and RONALD M. THIBAULT, *Appellants/Cross-Appellees.*

Opinion filed April 15, 1982.

*James D. Oliver,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for the appellants/cross-appellees.

*Don W. Noah,* of Noah & Harrison, P.A., of Beloit, for the appellee/cross-appellant.

Before ABBOTT, P.J., SWINEHART and MEYER, JJ.

SWINEHART, J.: This is an appeal arising out of a breach of

contract action filed by plaintiff Phillip W. Stanfield to recover royalties from defendant Osborne Industries, Inc., under a patent license agreement. Both Stanfield and Industries appeal from rulings on matters of law by the trial court and the jury verdict which established the breach of contract.

Defendant Osborne Industries raises the following issues: (1) Whether the trial court erred in finding that a license agreement, which required plaintiff to apply for a patent on a licensed product, required payment of royalties by Industries even though the product was not patented; (2) whether the trial court erred in finding that it was irrelevant whether plaintiff had a trade secret embodied in the product, and that plaintiff could recover royalties from Industries when he had neither a trade secret nor patent rights in the licensed product; (3) whether the trial court erred in refusing to admit evidence which would show the state of the prior art or otherwise show whether plaintiff's alleged invention embodied a trade secret, and, if so, precisely what aspect of the invention constituted the secret; (4) whether the trial court erred in refusing to allow Industries' expert witness to testify at trial; (5) whether the trial court erred in permitting improper cross-examination of Industries' witness, Ron Thibault, thereby eliciting inadmissible and prejudicial evidence; and (6) whether the trial court erred in sustaining a verdict contrary to the evidence and without substantial support in the evidence.

Plaintiff Stanfield raises the following issues: (1) Whether managing and controlling shareholders of a corporation are privileged to willfully and maliciously make false representations concerning the use of licensed inventions for the purposes of inducing a breach of confidential and contractual relations for their own personal gain; (2) whether the royalties paid should be based upon "net wholesale price" or on an amount determined by multiplying the units sold times the "distributor's price"; and (3) whether Industries' obligation to pay royalties should terminate according to the royalty agreement or after seventeen years from March 31, 1978, as ordered by the trial court.

In the early 1970's plaintiff Stanfield was living in the Osborne area. Although he had only a grade school education, Stanfield was known as something of a jack-of-all-trades. Stanfield was also an inventor and had built several things in a backyard shop, including a heating pad for farrowing baby pigs (hereinafter

referred to as a "pork pad"). Stanfield presented his inventions to some leading citizens of Osborne, who subsequently called a meeting in February of 1973 under the auspices of the Chamber of Commerce to seek investors for a company to manufacture Stanfield's products in Osborne. The citizens were concerned about the area's declining population and lack of job opportunities. Willing investors were found and steps were taken to organize Osborne Industries, Inc., as a Kansas corporation.

Later in the spring of 1973, Stan Thibault was contacted about becoming involved in the corporation. He was a native of Osborne and was living in Kansas City at the time. He had a college business degree and sales experience with the Mobil Oil Corporation, but had no manufacturing experience. Stan Thibault moved back to Osborne in September of 1973 to become president of Industries. One of his first acts as president of the new company was to sign the October 3, 1973 license agreement that had been previously prepared by attorneys for Stanfield and Industries and which is the primary subject of this case. This contract provided that Stanfield was the inventor of certain listed products and would make application for patents on those products. Stanfield granted Industries an exclusive license to manufacture the products if it so desired. In consideration for the license, Industries agreed to pay a royalty on its sales to Stanfield. It was also contemplated that Stanfield would come to work for Industries as its plant foreman, which he did, and it was hoped that he would develop other valuable products, which he did not.

Of the products listed in the license agreement, only the pork pad proved to be commercially acceptable and only royalties on the pork pads are in issue on appeal.

Stanfield built his first pork pad in November of 1972. Industries manufactured pork pads and paid royalties to Stanfield totaling $45,671.07 for the period of 1974 through November of 1976. This constituted full payment of royalties on the original gray-colored pork pad. Phillip Stanfield left the employ of Osborne Industries in 1975, and later left the State of Kansas altogether.

In 1976, an orange-colored pork pad, which allegedly was developed by Ron Thibault (Stanley Thibault's brother) and Dr. Louis Perky, was introduced by Industries. Ron Thibault had previously obtained stock in Industries and was employed by

Industries in April of 1974. Industries took the position that the new orange pork pad was a new and substantially different product from the original gray pork pad, and consequently, no royalties pursuant to the license agreement were paid to Stanfield for sales of the orange pork pad. At this time Industries also noted that there were competitive products on the market, and the protection of the proposed patent monopoly was not forthcoming.

Stanfield initially applied for a patent on the pork pad in November of 1973. The patent application filed by Stanfield had been rejected in March of 1974 and then abandoned, but on February 27, 1975, Stanfield refiled it as a continuation application. On February 5, 1976, the patent examiner rejected the application. An amendment to the application was filed in response to the rejection in June, 1976, but a final rejection was issued by the examiner in January of 1977. Stanfield's appeal of the decision was finally denied by the Board of Patent Appeals on March 31, 1978. This action, however, had already been commenced on February 27, 1977.

Plaintiff alleged in his petition that (1) defendant Industries had breached the contract to pay royalties; (2) that defendants Ronald and Stanley Thibault were individually liable for actual and punitive damages for breach of fiduciary duty for inducing the defendant corporation to breach the contract and thereby tortiously interfering with the contract; (3) that defendant Industries breached the contract by failing to exploit the other products licensed; (4) that defendant Industries is being unjustly enriched by continuing to use the "Stanfield" name on the products marketed from which it claims no royalties are due; and (5) that Industries is being unjustly enriched by appropriating trade secrets allegedly embodied in the pork pad.

After discovery, all parties moved for summary judgment on the ground that the contract was not ambiguous and each was entitled to judgment. The trial court, accepting the stipulation of the parties that the contract was not ambiguous, stated the following, quoted verbatim:

"The parties have reached a stipulation concerning the events arising about the scrivener to the Contract marked Exhibit A. . . . The parties stipulate and agree the final preparer of the contract was plaintiff's counsel. The question arises in this case over the construction of Paragraph 6 of the final contract and how it applies in respect to the entire contract in whole. Paragraph 6 of the contract sets out as follows:

'6. Industries hereby accepts the license hereinabove granted, subject to all the conditions expressed elsewhere in this agreement, [and in] consideration thereof agrees to pay to Stanfield a royalty of FIVE (5) per cent of the net wholesale price of the above-named products to which Stanfield holds patents or copyrights, or [h]as patents or copyrights pending, and on those items although not patentable which Stanfield has introduced and developed for Industries.'

"The first part of the contract under Section A it specifies the Stanfield Heating Pad for farrowing pigs, therefore, the heating pad being one of the above-named products, that heating pad which is still produced by Osborne Industries and which is the subject of controversy before the Court.

"It is not disputed by the parties that Mr. Stanfield did prosecute and make application for patents for the Stanfield Heating Pad, but was subsequently denied and that denial was not appealed on the Appellate Court level. He was, however, given a patent for a barrel warmer which was not produced except for a short time by the defendants herein, is not subject to any controversy before this Court.

"In viewing the contract in its entirety, it is apparent that the parties were originally contracting for the listed items, and further they made an additional contract because Mr. Stanfield was to go to work with the defendant Osborne Industries. That he also would be provided the royalties for those items that were not patentable which he introduced to them during his work with them. The Court reading the contract in its entirety finds that the section of Paragraph 6 which includes 'and those items are not patentable which Stanfield has introduced and developed for Industries', does not apply to the Stanfield Heating Pad, the Stanfield Heating Pad having been previously listed and being one of the above-named products in Paragraph A. Then there was a duty to obtain a patent upon those items listed in Paragraph A by plaintiff, Phillip W. Stanfield. That this was contemplated by the parties in viewing the contract as a whole.

"The defendant herein moves the Court for a judgment finding that upon the rejection of the patent, that his obligation under the contract was terminated to the plaintiff, and that it was expressly agreed within the contract that the patent be issued and the failure to issue such is a clear breach of the contract entitling the defendant to nullify same. The Court in viewing the contract in its entirety is not convinced that that is the proper interpretation. The Court, in viewing it in its entirety, would note that as long as Osborne Industries continued to produce the Stanfield Heating Pad as originally introduced by the plaintiff herein, would be liable royalties on the same, therefore, the defendant's Motion for Summary Judgment upon the first cause of action herein would be denied."

The trial court also found that the conduct of the individual defendants, Stanley and Ronald Thibault, was privileged and was within the interests of the corporation, and therefore sustained their motion for summary judgment on plaintiff's second cause of action concerning their tortious interference with plaintiff's contractual rights.

The trial court also sustained defendant Industries' motion for

summary judgment on Stanfield's third cause of action concerning a breach of contract by failure to exploit the exclusive license. The court similarly dealt with plaintiff's cause of action predicated upon Industries' misappropriation of plaintiff's trade secret. The trial court stated:

"The Court would find that in this case that the confidential misappropriation of trade secrets, and the unjust enrichment from there [sic] would have no bearing and would be encompassed within the issues which will be presented before the Court. . . .

"In this case the rights of the parties were established by a contract dated October 3rd, 1973. The question which the jury must determine is whether or not the current pad being produced is substantially different from the pad which was developed by Phillip Stanfield. If the pad is substantially the same, then Osborne Industries will owe royalties to the plaintiff based upon the contract."

The case was tried to a jury on the above stated issue and the jury found for plaintiff, deciding that the orange-colored pork pad as produced after November, 1976, was not substantially different from the original gray-colored Stanfield pork pad. A careful review of the record reveals that substantial competent evidence was presented which supports that verdict.

Industries' first allegation of error concerns the trial court's construction of the patent license agreement. Where, as here, it is stipulated by the contracting parties that the contract is not ambiguous, this court on appeal is free to examine the agreement and make its own determination as to the agreement's proper meaning. *Stith v. Williams,* 227 Kan. 32, 605 P.2d 86 (1980); *Keeler Co. v. Atchison, T. & S. F. Rly. Co.,* 187 Kan. 125, 354 P.2d 368 (1960).

The apparent focus of the controversy in this case centers around the construction of Paragraph 6 of the agreement which states:

"Industries hereby accepts the license hereinabove granted, subject to all the conditions expressed elsewhere in this Agreement, and in consideration therefore [sic], agrees to pay to Stanfield a royalty of Five (5) percent of the net wholesale price of the above named products to which Stanfield hold [sic] patents or copyrights or has patents or copyrights pending and those items, though not patentable, which Stanfield has introduced and developed for Industries."

The specific issue is whether the contract requires payment of royalties by Industries to plaintiff in the event that a patent is applied for but not obtained for the Stanfield pork pad. It is important to remember that the intent and purpose of a contract is

not to be determined by considering one isolated sentence or provision thereof, but by considering and construing the instrument in its entirety. *Lawrence v. Cooper Independent Theatres,* 177 Kan. 125, 276 P.2d 350 (1954); *Maltby v. Sumner,* 169 Kan. 417, 219 P.2d 395 (1950); *In re Estate of Koellen,* 162 Kan. 395, 176 P.2d 544 (1947).

When viewed in its entirety we find the primary purpose of this agreement to be the licensing of two categories of inventions: those already existing, having been created by plaintiff Stanfield and specifically listed in the contract, and those which Stanfield may create in the future during the course of his employment with Industries. The contract further provides for Stanfield to apply for and prosecute an application for letters of patent on the first class of inventions. Paragraph 6 of the agreement provides for the payment of royalties to Stanfield in consideration for the license granted to Industries. We find that the royalty provision applies to all inventions licensed by defendant Industries from Stanfield which are eventually manufactured and sold. Industries has the obligation to pay royalties on not only the subsequently introduced inventions but also on those existing inventions specifically listed in the agreement in which Stanfield had the obligation to pursue an application for a patent. The subsequent failure to obtain a patent on any of the listed inventions does not terminate Industries' obligation to pay royalties on the manufacture and sale of such invention. Since a patent was applied for and prosecuted by Stanfield and was subsequently denied, we find Paragraph 10 to be the relevant termination provision. That section provides:

"Industries agrees that this agreement shall terminate as to any one given product, Twelve (12) months after Industries, or its successors and assigns, fail to produce or sell such products but that this provision shall not be construed to terminate the entire agreement, provided however, that Industries continues to manufacture and sell other products as above set forth in this agreement and further Industries hereby agrees that upon the termination of this agreement, as above described, it shall forthwith cease to manufacture said products as specified by the Letters of Patent issued to Stanfield."

Industries argues that if this court interprets the contract to mean that a royalty is owing on the pork pad, notwithstanding the denial of the patent, the license agreement is nevertheless rendered unenforceable by preemption of federal patent law. In *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 59 L.Ed.2d 296,

99 S.Ct. 1096 (1979), the United States Supreme Court dealt with a case very similar to the one presented here on appeal. Applying the law recently stated there, we find that the enforcement of this patent license agreement is not inconsistent with the purposes of the federal patent system, which are: (1) to foster and reward invention; (2) to promote disclosure of inventions, stimulate further innovation, and permit the public to practice the invention once the patent expires; and (3) to assure that ideas in the public domain remain there for the free use of the public. We therefore hold that federal patent law does not preempt Kansas contract law under the particular facts of this case.

Industries next contends that the trial court erred in finding that whether or not the pork pad embodied a trade secret was irrelevant. Industries also argues that the court erred in excluding evidence concerning that question. We find that the trial court did not err on these two points. The court correctly determined that the rights and obligations of the parties were established by the contract. The finding that royalties were owing under the contract, notwithstanding the denial of the patent application, effectively renders Industries' contentions of error regarding trade secrets moot.

Industries next contends that the trial court erred in refusing to permit its expert witness to testify. The record clearly reflects that Industries failed to meet the pretrial deadline set for the exchange of the names of expert witnesses. In *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 1, 564 P.2d 508 (1977), the court held:

"A pretrial order, entered by the trial court pursuant to K.S.A. 60-216, controls the subsequent course of an action unless such order is modified at the trial to prevent manifest injustice. This proviso reposes in the trial court large discretionary powers."

We find that Industries has failed to show or establish on appeal that prejudice resulted from the exclusion of this expert witness or that the trial court abused its discretion under the circumstances of this case.

Industries next contends that the trial court erred in permitting a certain line of questioning on cross-examination of its witness, Ronald Thibault. The witness was questioned regarding a substantial number of pork pads returned to Industries from the sales outlets for possible defects. The trial court overruled Industries' objection to this line of questioning, stating: "This bears on the

evidence brought out in direct examination as to the stability of the pads and as to improvement." The scope of cross-examination in any particular case is a matter resting within the discretion of the trial court. *Rostine v. City of Hutchinson*, 219 Kan. 320, 329, 548 P.2d 756 (1976). "A trial court is vested with considerable discretion in determining the scope of cross-examination, and its rulings on objections to questions asked of a witness on cross-examination will not be disturbed on appeal, absent a showing of an abuse of discretion." *Frame, Administrator v. Bauman*, 202 Kan. 461, Syl. ¶ 1, 449 P.2d 525 (1969). We find no abuse of judicial discretion to exist regarding the allowance of this testimony. The cross-examination was clearly within the scope of direct examination and in no way inadmissible.

Plaintiff Stanfield's first contention of error is that the trial court erred in sustaining defendants' motion for summary judgment on plaintiff's second cause of action, holding that there is no question of fact as a matter of law, and the acts complained of by plaintiff against the individual defendants (Stanley and Ronald Thibault) would not allow plaintiff to recover under a theory of wrongful interference with plaintiff's contractual rights. Plaintiff alleged that the individual defendants, as corporate officers, interfered with plaintiff's contractual rights when, at a special meeting of the board of directors of Osborne Industries, which took place on October 14, 1976, they willfully, intentionally, maliciously, wrongfully and for personal financial gain, induced the board of directors to cease paying Stanfield royalties under the October 3, 1973, license agreement. The trial court based its decision on the following rule which was stated in *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 425, 370 P.2d 390 (1962):

"[T]he officers and agents of a corporation, acting for and on behalf of their corporation, would not be liable for inducing action by the corporation which it could lawfully undertake to do under a contract of employment. Under such circumstances the conduct of the officers and agents of the corporation is privileged."

In *Collier v. Operating Engineers Local Union No. 101*, 228 Kan. 52, Syl. ¶ 2, 612 P.2d 150 (1980), the court held:

"An appellate court in examining the validity of a motion for summary judgment should read the record in the light most favorable to the party who defended against the motion. It should accept such party's allegations as true, and it should give him the benefit of the doubt when his assertions conflict with those of the movant."

In *Supreme Petroleum, Inc. v. Briggs,* 199 Kan. 669, 677, 433 P.2d 373 (1967), the court stated:

"We are mindful that in applying the summary judgment rule, a question of fact created by allegations, standing alone, is not sufficient to control the application. In discussing the principle in *Meyer, Executor v. Benelli,* 197 Kan. 98, 415 P.2d 415, we said:

" ' . . . The rule was intended to permit a party to pierce the allegation of facts in his opponent's pleadings by affidavits and discovery, thus controlling the formal issues presented by the pleadings. (Citing cases.)' (pp. 100, 101.)

"However, in considering the effect of affidavits and discovery, we are compelled to give to the party, against whom summary judgment is sought, the benefit of all reasonable inferences that may be drawn from the facts under consideration. (*Green v. Kaesler-Allen Lumber Co.,* 197 Kan. 788, 420 P.2d 1019, and cases cited therein.)"

In *In re Estate of Mullin,* 201 Kan. 756, 761, 443 P.2d 331 (1968), the court stated:

"The purpose of summary judgment is to make possible the expeditious disposition of cases in which there are no genuine issues of material fact upon which the outcome of the litigation depends. In determining whether a motion for summary judgment is well founded, the court may pierce formal allegations of fact in pleadings and determine from the entire case whether there are genuine issues of fact to be resolved at a formal trial. Flimsy or transparent allegations are insufficient to sustain a justiciable controversy requiring the submission thereof to the trier of facts. (*Meyer, Executor v. Benelli,* 197 Kan. 98, 415 P.2d 415; *Hartman v. Stumbo,* 195 Kan. 634, 408 P.2d 693; *Brick v. City of Wichita,* 195 Kan. 206, 403 P.2d 964; *Whelan v. New Mexico Western Oil and Gas Company,* 226 F.2d 156 [10th Cir. 1955]; *Schreffler v. Bowles,* 153 F.2d 1 [10th Cir. 1946].)"

In *Bowen v. Westerhaus,* 224 Kan. 42, 45, 578 P.2d 1102 (1978), the court held:

"In considering a motion for summary judgment a trial court must give to a litigant against whom judgment is sought the benefit of all inferences that may be drawn from the admitted facts under consideration. (*Timi v. Prescott State Bank,* 220 Kan. 377, Syl. ¶ 2, 553 P.2d 315 [1976].) A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties. (*Henrickson v. Drotts,* 219 Kan. 435, 438, 548 P.2d 465 [1976].) Whether a party acts in good faith depends not only on the facts and circumstances but also on his state of mind."

See also *Gleichenhaus v. Carlyle,* 226 Kan. 167, 169, 597 P.2d 611 (1979).

*May v. Santa Fe Trail Transportation Co.,* 189 Kan. 419, the decision relied upon by the trial court in the present case, was an

action against the Santa Fe Trail Transportation Company and three of its officials for an alleged unlawful discharge of the plaintiff from employment. The question presented was whether the petition stated a cause of action on the ground that the individual defendants unlawfully conspired to cause the discharge of the plaintiff from employment. The court held:

"Where . . . individual defendants are named and described as officials of the corporate defendant in the petition, with no allegations that these defendants acted other than in their official capacities on behalf of the corporate defendant, and no allegation remotely indicates that they were pursuing their course as individuals or for individual advantage, the acts of the individual defendants must be regarded as the acts of the corporation, and when so acting they cannot conspire with the corporation of which they are a part."

The distinction between *May* and the present case is that in the present case there is an allegation that the individual defendants were acting for individual advantage. In plaintiff's petition he alleges that the individual defendants acted to enhance their personal financial position and that the acts were carried out for the purpose of acquiring for themselves the rights and property of the plaintiff. Because of this factual distinction, the court's decision in *May* is not dispositive of the issue presented here.

After a careful review of the pleadings, depositions and records available to the trial court at the time the summary judgment motions were heard, we find that no question of material fact remained unresolved, even though plaintiff contends that the individual intent of defendants was to materially benefit themselves as stockholders, and further that they had breached a fiduciary duty owed to plaintiff. We find that although the individual defendants were corporate officers and substantial stockholders of the corporation, all of the acts complained of by plaintiff were acts performed by defendants in their official capacities for the corporation. These acts included furthering the development of the pork pads by improving the materials used and the method employed in the manufacture of the pads, determining the status of plaintiff's patent application and seeking information concerning competitors' products and their construction. All of these actions were done while acting within their corporate capacities. The recommendation to the board of directors regarding the termination of royalties to plaintiff for the pork pads was also made by the individual defendants while acting in their corporate capacities. The individual defendants informed

the board of directors of the current status of their pork pad development and contrasted it with the original pork pad as produced and sold under their license agreement with plaintiff. Defendants proposed that the royalties be terminated since the products were different. We find this action to be reasonable in light of the substantial question as to whether these two pads were substantially the same pads. While it is true that the individual defendants would personally benefit derivatively from the termination of the royalty payments to plaintiff, we find that the issue concerning defendants' state of mind not to be an unresolved question of fact. A cautious review of the record on this issue reveals that the acts by the individual defendants complained of by plaintiff were so completely and utterly related to their official corporate responsibilities that the admitted fact of personal benefits as stockholders as a result of the termination of the royalties is totally insufficient as to leave a question of fact unresolved. We therefore hold that the trial court did not err in granting summary judgment on this issue.

Plaintiff's final contention of error concerns the manner of computation and duration of the royalties to be paid to Stanfield by Industries. The trial court ordered the royalties to be computed by multiplying the number of units sold times the "distributor price" per unit. The court also determined that Stanfield was not entitled to royalties for the pork pad beyond the period of seventeen years after March 31, 1978 (the date on which the patent for the pork pad was denied).

We agree with Stanfield's contention and reverse the trial court in that it erred in both respects. The parties' agreement clearly and unambiguously defines in Paragraphs 6 and 7 how the royalties are to be computed:

"6. Industries hereby accepts the license hereinabove granted . . . and in consideration therefore, [sic] agrees to pay to Stanfield a royalty of Five (5) percent of the net wholesale price of the above named products. . . . The Five (5) percent shall be applicable to such products or merchandise actually billed by Industries to dealers, distributors, wholesalers, or individuals, as evidence [sic] by Industries' invoices for the same. . . . It is understood and agreed that the royalty percentage shall be based upon the net wholesale price of each and every unit of products manufactured and sold as above described.

"7. The price received by Industries, F.O.B. factory, from its customers for the sale of said above described products shall be deemed to be the net wholesale price of Industries for the purpose of computing the royalties hereunder."

We have already stated above that Paragraph 10 is the relevant termination provision and, consequently, Industries will.be obligated for royalties until such time as it ceases production of the licensed products.

The judgment in favor of plaintiff Stanfield against defendant Industries is affirmed as to the liability of Industries to pay royalties, and the case is remanded to the trial court for the mathematical computations, to the date of this order, of the total amount of damages to be recovered by Stanfield under the terms of the contract.

Affirmed in part, reversed in part and remanded with directions.