**Louis W. WEGERER and Judith A. Wegerer, Plaintiffs-Appellees,**

v.

**FIRST COMMODITY CORPORATION OF BOSTON, et al., Defendants-Appellants.**

**No. 82–1686.**

United States Court of Appeals, Tenth Circuit.

Sept. 10, 1984.

Rehearing Denied Oct. 11, 1984.

Theodore C. Beckett, Kansas City, Mo. (Don R. Lolli and Emmett J. McMahon, Kansas City, Mo., with him on brief) of Beckett & Steinkamp, Kansas City, Mo. (Charles C. Rankin, Lawrence, Kan., of counsel), for plaintiffs-appellees.

Arthur L. Smith, Washington, D.C. (Thomas W. Van Dyke, J. Michael Vaughan, and James C. Tilden of Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., on brief), for defendants-appellants.

Before BARRETT, BREITENSTEIN and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

First Commodity Corporation of Boston (FCCB), Donald R. Schleicher, and his brother, Richard A. Schleicher (Appellants) appeal from an adverse jury verdict and remittitur judgment entered in favor of Louis and Judith Wegerer (Wegerers). The Wegerers were awarded $10,775.00 in actual damages and $250,000.00 in punitive damages on a finding that appellants and one Robert Jones,[1] a former account executive for FCCB, conspired to defraud the

---

1. Robert Jones was never served and was, accordingly, never a part of the lawsuit.

Wegerers in the sale of two copper commodity option contracts. The evidence presented at trial was developed exclusively by the Wegerers; the appellants rested without presenting any evidence.

## BACKGROUND

FCCB is a corporation doing business as a commodity option brokerage firm with its main office in Boston and sales offices in Chicago, Miami, San Francisco, New York, and Newport Beach. FCCB is a private, closely-held corporation whose stock is owned by Donald Schleicher (80%) and Richard Schleicher (20%). At all times relevant hereto, Donald Schleicher was president, treasurer and chairman of the board of directors of FCCB, while Richard Schleicher was vice-president, secretary, and the only other member of FCCB's board of directors. Richard Schleicher did most of the research for FCCB. Over the years FCCB has enjoyed tremendous financial success and the Schleichers have profited accordingly. In his deposition Donald Schleicher testified that he and Richard had recently sold 20% of FCCB, for which he had received $3,900,000 and Richard had received $900,000; that FCCB was selling several of its offices to a partnership for $6,000,000, and that the proceeds of the sale would go to himself and his brother over a three to four year period. FCCB held itself out to be the oldest commodity options specialist on the East Coast with considerable financial strength, and one of America's most accomplished and professional commodity option brokerage firms. FCCB employs several hundred salesmen to sell various option contracts.

On November 11, 1976, FCCB, through Donald Schleicher as President, and Donald and Richard Schleicher, individually, and on behalf of "their affiliates, officers, agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them" (R., Pl.Ex. 33 at 2) entered into a consent decree with the Commodity Futures Trading Commission permanently enjoining each of them from using the mails or any means or instrumentalities of interstate commerce to cheat or defraud any person by: (1) disseminating by means of oral representations or written materials expected and predicted profits and returns from commodity options and futures transactions, (2) representing that commodity options or commodity transactions are guaranteed, backed, escrowed or collateralized for the benefit and protection of purchasers of commodity options, (3) failing to disclose or misrepresenting the actual amount of the purchase price of commodity options, including a separate listing of the premium, markups on the premium, costs, fees, and commissions, (4) executing commodity option transactions and commodity futures contracts without the consent, knowledge, and/or authorization of its customers; (5) failing or omitting to disclose or misrepresenting the price level which a commodity must reach during the life of an option before an option customer will realize a profit, (6) failing or omitting to disclose that specific market movements of a commodity or contract of sale of a commodity for future delivery cannot be accurately predicted, (7) failing or omitting to disclose the nature and character of a customer's investment in commodity options, (8) failing or omitting to relate all additional costs which may be incurred by an option customer if the option is exercised, and (9) failing to disclose or misrepresenting the fact that a commodity option purchased by a customer had earlier been purchased for the account of FCCB or another customer of FCCB.

## FACTS

During early April 1978, Louis Wegerer, a railroad engineer responded to an FCCB advertisement.[2] Although neither Louis nor his wife, Judith, both residents of Marion, Kansas, knew anything about stocks, bonds, or commodities, they decided to respond to the FCCB advertisement which stated that "Mr. X invested $3,445; nine

---

**2.** Although Wegerer responded to an FCCB advertisement in the *Houston Post,* FCCB was also advertising in the *Kansas City Star* and *Wichita Eagle* during 1977 and 1978.

months later he received $24,213." Within several days after responding to the ad, the Wegerers received the first of what was to be a series of phone calls from Robert Jones, an account executive for FCCB, from New York. Although the Wegerers told Jones that they knew nothing about dealing in commodities or investments and that they could not afford to invest in commodity option contracts, Jones persisted. He made thirty to forty telephone calls to the Wegerers over a period of several weeks. During the course of his telephone conversations with the Wegerers, Jones related, *inter alia:* an investment in copper commodity option contracts was completely safe; the Wegerers would make money with each rise in the price of copper; that copper was rising and the Wegerers were sure to make a profit; that the Wegerers should not review the documents and information mailed to them by FCCB because it was too complicated for them to understand and the information was sent out merely to fulfill a legal requirement; that he was an expert in commodities; and he was making many people a lot of money and that the Wegerers should trust him with their investment.

Based on Jones' representations, the Wegerers withdrew some of their savings and also obtained a bank loan, all in Kansas, for investing $5,375 with FCCB on May 8, 1978, and $5,400 with FCCB on May 30, 1978, in copper commodity options traded on the London exchange. Subsequent to making these investments, the Wegerers discovered, for the first time, (1) that FCCB charged a commission brokerage fee equal to 100% of the purchase price of the copper commodity options they had purchased, (2) that two days after they had purchased their second option contract, the sale of commodity options was banned in the United States by the Commodity Futures Trading Commission because of rampant fraud in the sale of such options, and (3) that the price of copper had to rise a fixed amount before they could even recover their initial investment.

After the Wegerers purchased their second contract, Jones stopped calling them.

Despite repeated attempts, the Wegerers were unable to contact Jones again. The Wegerers subsequently sued FCCB, the Schleichers, and Jones alleging that they were persuaded to purchase two copper option contracts which were worthless at the time they were purchased and that the actions of the appellants and Robert Jones in inducing them to effectuate the purchases were in violation of federal law and constituted fraud and conspiracy to defraud under Kansas law.

Following a three day trial, the jury returned a verdict against FCCB and the Schleichers, awarding the Wegerers $15,000 in actual damages and $1,000,000 in punitive damages. Following appellants' post-trial motions, the district court entered an order denying a new trial and appellants' motion for a judgment notwithstanding the verdict. The district court did, however, grant appellants' motion for a remittitur. The court reduced the Wegerers' actual damages to $10,775.00, the purchase price of the contracts, and the Wegerers' punitive damages to $250,000.00.

### ISSUES

On appeal FCCB and the Schleichers contend the district court erred by: (1) refusing to give their requested instruction on justifiable reliance, (2) refusing to grant a new trial after finding that the $1,000,000 punitive damage award was excessive, (3) denying their motions for directed verdict and a new trial, (4) submitting Instructions 9–11A since officers, directors or employees of a corporation acting in their official capacity on behalf of a corporation cannot conspire with their corporation, (5) holding that it had personal jurisdiction over the Schleichers, (6) admitting the 1976 consent decree, (7) admitting the testimony of two other FCCB customers, and (8) by ruling that various complaints filed with the Commodities Futures Trading Commissioner by unrelated parties could be used for cross-examination of any defendant.

### I.

Appellants contend that the district court erred in refusing to give their requested

instruction defining justifiable reliance. Appellants argue, citing to *Goff v. American Savings Association of Kansas*, 561 P.2d 897, 903 (Ct.App.Ks.1977), that the test for determining when reliance is justified is whether the plaintiffs had "information which would serve as a danger signal and a red light to any normal person of his intelligence and experience" and that the district court erred by not instructing accordingly.

In rejecting the appellants' proffered instruction, the district court stated:

> The reason I rejected this [instruction], the way you submitted it is that you are trying to get comparative fault in this case and the court isn't about to let you turn this into a negligence case.

(R., Vol. X at 304–305.)

■■■ Thereafter, the district court instructed the jury on justifiable reliance in Instruction No. 8:

> A party claiming to have been defrauded by a false representation or concealment must not only have acted in reliance thereon but must have been justified in such reliance, that is, the situation must have been such as to make it reasonable for him, in the light of the circumstances and his intelligence, experience and knowledge, to accept the representation without making an independent inquiry or investigation.

(R., Vol. II at 291.)

Under these circumstances we hold that the district court did not err in refusing the appellants' proffered instruction. Whereas a party is, upon proper request, entitled to an instruction upon his theory of the case if there is evidence to support it, *Brandes v. Burbank*, 613 F.2d 658 (7th Cir.1980), a party is not entitled to have the jury instructed in the particular language of its choice. *Frosty Land Foods International, Inc. v. Refrigerated Transport Co., Inc.*, 613 F.2d 1344 (5th Cir.1980); *Baker & Co. v. Preferred Risk Mutual Insurance Co.*, 569 F.2d 1347 (5th Cir.1978). Instruc-

tions must be considered as a whole and particular instructions and requests for instructions are to be considered in the framework of the entire charge. *Marshall v. Ford Motor Company*, 446 F.2d 712 (10th Cir.1971). The district court's instructions were proper and adequate.

We have also considered the applicability of our *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511 (10th Cir.1983), cited by both parties in supplemental authority letters to the court. We hold *Zobrist* to be distinguishable.

*Zobrist* involved an action brought by purchasers of stock against the sellers to recover for fraud. In *Zobrist* we held that the warnings and statements contained in a private placement memorandum could be imputed to a sophisticated investor even though he had not read them and that the investor could not justifiably rely on misrepresentations where the falsity of the misrepresentations is palpable. Such is not the case at hand.

Neither of the Wegerers were sophisticated investors. Furthermore, it is uncontested that the Wegerers were told not to read the materials sent to them; that Jones told the Wegerers the materials were sent by FCCB merely to comply with a legal requirement; that the Wegerers were lied to repeatedly; and that the Wegerers were "badgered" by numerous telephone calls and pressured into investing.

## II.

■■ Appellants argue that the district court erred in admitting the 1976 consent decree executed by FCCB and the Schleichers.[3] Appellants contend that although the district court admitted the decree for the limited purpose of showing intent and knowledge and instructed the jury accordingly, that the consent decree was nonetheless inadmissible for any purpose under Rules 410, 408, 404(b), 403, 402 and 802 of the Federal Rules of Evidence. Appellants

---

**3.** The decree was also executed by John Farwell Howe, III, individually, who is not a party herein.

further contend that the limiting instruction given by the court did not cure the prejudice suffered by the appellants as a result of the admission of the consent decree. We disagree. We hold that the district court properly admitted the consent decree for the limited purpose of showing intent and knowledge under Rule 404(b).

Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person or to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plain knowledge, identity, or absence of mistake or accident.

Within Instruction No. 12 the district court charged the jury:

Certain evidence has been admitted of alleged similar misrepresentations made by defendants to one Jerry Kerr and Michael Collins. Also there has been received into evidence Exhibit 33, a consent decree involving claims between the Commodity Futures Trading Commission and persons named in the consent decree, including the defendants in this action.

This evidence has been admitted for limited purposes only as being relevant to defendants' intent to defraud plaintiffs, any scheme or plan on the part of defendants to defraud plaintiffs, and also defendants' knowledge of the alleged falsity of misrepresentations made to plaintiffs.

The admission of the consent decree, as limited, was particularly appropriate in this case for purposes of showing intent and knowledge. In *United States v. Barbieri*, 614 F.2d 715, 719 (10th Cir.1980) we stated:

Under Fed.R.Evid. 404(b), evidence of crimes not charged in the indictment may be admitted to prove, among other things, intent and plan. *See United States v. Ahern*, 612 F.2d 507, 509 (10th Cir.1980). The admissibility of such evidence is within the sound discretion of the trial judge. *See United States v. Nolan*, 551 F.2d 266, 271 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54

L.Ed.2d 191 (1977). We find no abuse of discretion here.

Matters of intent and plan were crucial in this case. The evidence was relevant for a purpose other than showing bad character; it was clear and convincing; and its probative value substantially outweighed the danger of prejudice. *See United States v. Scholle*, 553 F.2d 1109, 1121 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). The St. Louis evidence showed the dimensions and continuing nature of Barbieri's scheme. It put the activities in Oklahoma City in context. *See United States v. Pauldino*, 443 F.2d 1108, 1113 (10th Cir.), *cert. denied*, 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163 (1971). Finally, it provided a basis for understanding the testimony—...

*See also Jerry J. Kerr v. First Commodity Corporation of Boston*, 735 F.2d 281 (8th Cir.1984) in which the Court upheld the admission of the same consent decree here involved "solely for the purpose of demonstrating First Commodity's knowledge and intent to commit the fraud insofar as such knowledge and intent are relevant to the issue of punitive damages" at 286. Although the district court in the instant case did not limit the consent decree solely for consideration of punitive damages, the decree was properly admitted since the Wegerers not only sued FCCB, but also the Schleichers, and the punitive damages awarded the Wegerers were assessed only against FCCB.

### III.

Appellants contend that the district court erred in giving Instructions 9 through 11A on conspiracy because the evidence failed to establish that any of the individual defendants were acting outside their official capacities on behalf of FCCB. Appellants cite *May v. Santa Fe Transportation Co.*, 189 Kan. 419, 370 P.2d 390 (1962) for the general rule that officers, directors or employees of a corporation, acting in their official capacities on behalf of the corporation, cannot conspire with the corporation.

Appellants acknowledge that the court in *May* implicitly recognized an exception to the general rule, set forth in *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391 (4th Cir.1974) and *Jewel Foliage Co. v. Uniflora Overseas Florida,* 497 F.Supp. 513 (M.D.Fla.1980), that officers, directors, or employees of a corporation who personally benefit from the illegal activities in a way separate and distinct from the corporation may be held to be a participant in a conspiracy with their corporation. Appellants contend that the pivotal question of whether the Schleichers conspired with FCCB must be resolved by determining whether they were acting within their official capacities on behalf of the corporation or whether they were acting for their individual benefit.

Appellants argue that the evidence presented by the Wegerers does not contradict their contention that the individual defendants were acting within their official capacities for FCCB when dealing with the Wegerers. They cite *Jewel Foliage v. Uniflora Overseas Florida, supra,* for the proposition that mere stock ownership does not preclude the application of *May,* and *Stanfield v. Osborne Industries, Inc.,* 7 Kan.App.2d 416, 643 P.2d 1115 (1982) for the proposition that the mere accrual of personal benefits to individual shareholders, such as the Schleichers, does not remove a case from the *May* holding, whenever the actions of the individual defendants are completely related to their corporate responsibilities. Finally, appellants contend that "the 1976 consent decree provides no evidence of the individual benefit which plaintiffs must prove the Schleichers received in order to prove a civil conspiracy." (Brief of Defendants-Appellants at 22.)

■ Kansas has long recognized that there may be recovery against all the members of a civil conspiracy by one who has suffered damages as a result of actionable conduct by one or more of the conspirators pursuant to the conspiracy. *Ammon v. Kaplow,* 468 F.Supp. 1304, 1312 (D.Ks. 1979), citing *International Union, United*

*Auto, et al. v. Cardwell Mfg. Co.,* 416 F.Supp. 1267, 1290 (D.Ks.1976). Under the law of Kansas, a plaintiff may either prove the conspiracy by admissible acts of the conspirators, or by admissible acts of different persons. *Beverly v. McCullick,* 211 Kan. 87, 505 P.2d 624, 626 (1973). Furthermore, the reckless misrepresentations of an employee such as Jones, who is also a co-conspirator, are imputed to FCCB. *First Commodity Corporation of Boston v. CFTC,* 676 F.2d 1 (1st Cir.1982).

Within Count II of their complaint, the Wegerers alleged that FCCB, Donald and Richard Schleicher, together with Robert Jones, pursuant to a conspiracy to defraud, committed tortious acts against them, i.e., false and fraudulent representations and concealing material facts which they relied upon in purchasing two copper commodity option contracts from FCCB for $10,775.00. In determining whether the district court properly instructed on conspiracy we must decide whether (1) the Wegerers established a civil conspiracy, and (2) whether the Wegerers established that the Schleichers were acting outside their official capacities for their personal gain.

■ The Wegerers presented evidence which established that: they responded to an FCCB advertisement which stated that one of its clients had made a profit of 827% in one year; Donald and Richard Schleicher were the principal officers and only directors and shareholders of FCCB; Robert Jones, an FCCB account executive, made numerous phone calls to them within a relatively short period of time during which time he held himself out to be an expert; Jones stated that the Wegerers did not need to read the written material sent to them by FCCB since they would not be able to understand it and the information was being sent out merely to fulfill a legal requirement; Jones stated that copper prices were rising and that they were certain to make a profit; the Wegerers wired FCCB funds totaling $10,775; FCCB accepted the wired funds and mailed out confirmations; FCCB did not sent the Wegerers the contracts Jones said would be sent;

the Wegerers were not knowledgeable, sophisticated investors; the Wegerers relied exclusively on Jones as an employee of FCCB in purchasing the option contracts; the Wegerers were unaware that the commission fees on their purchases would equal 100% of the purchase price of the option contracts; FCCB and the Schleichers had entered into a consent decree in 1976 in which FCCB and the Schleichers agreed to cease and desist from a variety of deceptive practices, many of which were identical to the practices utilized in defrauding the Wegerers.

Under these circumstances, we hold that the Wegerers established a civil conspiracy to defraud. We further hold that this same, uncontested, evidence established that the Schleichers were acting outside their official capacities as officers and directors of FCCB. They were acting for their personal gain.

In evaluating whether the Schleichers were acting outside of their official capacities for their own personal gain, we view the consent decree executed by FCCB and the Schleichers to be of primary importance. Under the decree, voluntarily executed by FCCB and the Schleichers, the Schleichers agreed to be permanently enjoined from cheating or defrauding any other person by, *inter alia:* representing expected or predicted profits and returns from commodity options, failing to disclose or misrepresent the actual purchase price of commodity options, failing to disclose that the market movements of commodity options or contract cannot be accurately predicted, and failing or omitting to disclose material facts about the nature and character of a customer's investment in commodity options.

Notwithstanding the Schleichers' voluntary execution of the consent decree on November 11, 1976, the Wegerers presented unchallenged evidence that: after November 11, 1976, FCCB sold them and numerous other customers commodity options utilizing the very fraudulent and deceptive practices permanently enjoined by the consent decree; subsequent to the execution of the consent decree, FCCB's earnings flourished and Donald and Richard were personally able to sell 20% of FCCB for $4,800,000 and to also personally sell several sales offices for $6,000,000, and that sales proceeds went directly to the Schleichers; and that during this period the Schleichers were borrowing large sums of money from FCCB at six percent per annum interest rates with very favorable repayment terms.

Under all of the circumstances, we hold that the Wegerers presented substantial evidence from which the jury could find that the Schleichers were acting outside of their official capacities as officers and directors of FCCB for their personal benefit and that the Schleichers could, accordingly, conspire with FCCB in defrauding the Wegerers. The Schleichers personally benefited from the illegal activities (fraudulent sale of commodity options) in a way separate and distinct from FCCB.

Assuming, arguendo, that the Wegerers did not present sufficient evidence upon which the jury could find that the Schleichers were acting outside their official capacities for their personal benefit, the facts in evidence do, in our view, support the application of the alter ego doctrine. In *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358, 1362 (10th Cir.1974) we stated:

> Kansas, however, has recognized the alter ego doctrine. *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 473 P.2d 33 (1970). Under this doctrine, the corporate entity is disregarded and liability fastened on an individual who uses the corporation merely as an instrumentality to conduct his own personal business. The liability must arise from fraud or injustice perpetrated on third parties dealing with the corporation. *Id.* 473 P.2d at 42. *See Doyn Aircraft, Inc. v. Wylie,* 443 F.2d 579 (10th Cir.1971).

█ It is uncontested that the appellants' liability to the Wegerers arose from the fraud perpetrated on them (Wegerers) through their dealings with FCCB. There is sufficient evidence in the record permitting the jury to conclude that the Schleich-

ers, as the principal officers and only shareholders and directors of FCCB, were utilizing FCCB "merely as an instrumentality to conduct ... [their] own personal business." This is particularly true when, as here, the Schleichers executed the 1976 consent *individually*. Applying the alter ego doctrine to the facts herein, FCCB's existence as a corporate entity must be disregarded and the Schleichers reliance on *May, supra,* for the general rule that officers, directors or employees of a corporation acting in their official capacities cannot conspire with the corporation, is without merit. Thus, we hold that the district court properly instructed the jury by giving Instructions 9 through 11A on conspiracy.

## IV.

The Schleichers contend that the district court erred in finding that it had personal jurisdiction over them.[4] The Schleichers argue that the district court erroneously asserted jurisdiction under K.S.A. § 60–308(b)(2) (1976) when the only contacts they had with Kansas were: (1) execution of the 1976 Consent Decree, (2) in an affidavit, Don Schleicher stated a form letter bearing his signature stamp was mailed to Louis Wegerer in Kansas, and (3) copies of investment recommendations generated by Richard Schleicher were mailed to the Wegerers in Kansas. The Schleichers argue that the district court erroneously concluded that this evidence presented a prima facie showing that the Schleichers had committed a tortious act within Kansas and had sufficient "minimum contacts" with the state to satisfy due process. Schleichers also argue that the district court erroneously found jurisdiction over them individually by way of jurisdiction over FCCB.

▆▆▆▆ A party invoking the jurisdiction of the federal courts has the burden of proving that federal jurisdiction does exist. *Basso v. Utah Power and Light Company,* 495 F.2d 906 (10th Cir.1974). A federal court, in diversity actions, may obtain personal jurisdiction over nonresidents of the state in which the district court is located by complying with the state's long-arm statute. *Quarles v. Fuqua Industries, Inc., supra.* Jurisdiction over the individual officers of a corporation, however, may not be obtained merely by accomplishing jurisdiction over the corporation. *Escude Cruz v. Ortho Pharmaceutical Corporation,* 619 F.2d 902 (1st Cir.1980); *Wilshire Oil Company of Texas v. Riffe,* 409 F.2d 1277 (10th Cir.1969).

▆▆▆▆ In meeting the threshold burden of establishing in personam jurisdiction in a diversity action, a Kansas plaintiff need only make out a prima facie case of the jurisdictional fact of conspiracy or entry into the state. *Professional Investing Life Ins. Co. v. Roussel,* 445 F.Supp. 687 (D.Ks.1978). Kansas' long-arm statute, § 60–308(b)(2), provides in part:

> Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person ... to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) commission of a tortious act within this state;

Fraud and deceit in inducement to contract are clearly torts that may cause Kansas residents sufficient injury to invoke Kansas' legitimate protective interests under § 60–308(b)(2). *J.E.M. Corporation v. McClellan,* 462 F.Supp. 1246, 1252 (D.Ks. 1978). A plaintiff need not establish that a defendant was actually present in Kansas to effectuate service under § 60–308(b)(2), or that the tortious act complained of occurred in Kansas. In *J.E.M. Corporation, supra,* the court opined:

> It is inconceivable that the legislature did not also intend to extend service to tortious acts outside the forum that cause

---

4. We previously denied the Schleichers' Writ of Prohibition which sought review of the district court's denial of their motion to dismiss for lack of personal jurisdiction. *First Commodity Corporation of Boston v. The United States District Court,* No. 80–1766 (Aug. 29, 1980).

tortious injury to a resident in the state, particularly in this day of instant long-range communications when one can engage in extensive purposeful activity here without ever actually setting foot in the state. See *Professional Investors Life Ins. Co. v. Roussel, supra,* at 695, quoting *Ghazoul v. International Management Services, Inc.,* 398 F.Supp. 307 (S.D.N.Y.1975).

462 F.Supp. at 1252.

Applying these standards to the facts herein, we hold that the district court did not err in finding that it had in personam jurisdiction over the Schleichers.

## V.

We have carefully considered the appellants' remaining allegations of error and find them to be individually and collectively without merit.

WE AFFIRM.

McKAY, Circuit Judge, concurring in part and dissenting in part:

I regret that I am unable to fully concur in the court's opinion and disposition of this case. I am at odds with two issues discussed by the majority. First, whether the plaintiffs presented sufficient evidence to instruct the jury on conspiracy. Second, whether the trial court had personal jurisdiction over the two individual defendants.

The employee Jones' involvement in committing a fraud against plaintiffs is not in question. Likewise the corporation's liability for those fraudulent acts is established. However, plaintiffs are also trying to impose individual liability on the officers of the corporation. The analysis required to impose liability on the officers is distinct from that required to find the corporation liable.

The elements of conspiracy in Kansas are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."

*Citizens State Bank v. Gilmore,* 226 Kan. 662, 603 P.2d 605, 613 (1979).

The rule that a corporation cannot conspire with its officers, directors and employees falls under the first element. If the acts of an officer, director or employee are within the scope of their duties, the acts are attributed to the corporation. Thus all of the acts are acts of the corporation and the requirement of two or more persons is not met. I believe plaintiffs failed to show that the individual defendants or the corporation employee Jones were acting outside their official capacities for their personal gain. Thus, it is unnecessary to consider whether plaintiffs established the other elements of civil conspiracy.

The majority lists several facts which it believes establish the individual defendants' "personal gain." First, the majority places heavy emphasis on the consent decree signed by the individual defendants and the fact that defendants continued to engage in the practices enjoined by the consent decree. That conduct, according to the majority, allowed FCCB to flourish. Notwithstanding the unchallenged nature of those facts, they do not in any way establish that the individual defendants were acting outside of their official capacity as officers of the corporation.

The majority next relies on the fact that the individual defendants sold twenty percent of their stock for $4,800,000. The mere ownership or sale of stock does not constitute the type of personal gain required to vitiate the general rule that a corporation cannot conspire with its officers. *Jewel Foliage Co. v. Unifora Overseas Florida,* 497 F.Supp. 513 (M.D.Fla. 1980); *see Stanfield v. Osborne Industries, Inc.,* 7 Kan.App.2d 416, 643 P.2d 1115 (1982).

The third fact relied on by the majority was that the individual defendants were to receive $6,000,000 from the sale of several FCCB offices. Both plaintiffs and the majority assert that the record clearly establishes that the individual defendants were to receive this money directly. The record

is not so unambiguous. The only evidence presented to the jury was the deposition of one of the defendants:

QUESTION: So within three or four years you expect to realize six million dollars from the sale of these offices?

ANSWER: Correct.

QUESTION: Where will the proceeds of that sale go?

ANSWER: Proceeds of the sale will go to myself and my brother.

Record, vol. 10, at 250. The record could imply that they were to receive the money directly or that they were to receive it by virtue of their stock ownership. Defendants assert the latter. Appellants Reply Brief at 13.

Finally, the majority points out that the individual defendants received low interest loans from the corporation. Again, while this is true, it does not lead to the conclusion that the individual defendants acted outside their official capacities for "personal gain" in connection with the transactions here at issue.

All of the factors pointed to by plaintiffs and the majority are regular incidents of being an officer and shareholder of a corporation. Such factors are not akin to the factors found sufficient to establish a "personal gain" in other cases. For example, in *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399–400 (4th Cir. 1974), there was evidence that the president of the defendant company would receive money from an independent third party that would profit from the alleged illegal conduct.

If the exception to the rule is not limited to situations where an officer or employee receives a benefit or personal gain from an outside source, the rule will be swallowed up by the exception. Large salaries, bonuses, personal loans, stock options, etc. are common methods of remuneration for officers of corporations. Each could qualify as "personal gain" under the majority's analysis. Furthermore, the evidence introduced by plaintiffs and relied on by the majority does not show any connection or contact between Jones, the employee, and the individual defendants except that defendants were officers of the corporation which employed Jones.

Because the defendants were acting within their official capacity and not for any outside personal gain, I would adhere to the general rule that a corporation cannot conspire with its officers. Accordingly, plaintiffs have failed to establish the first element of civil conspiracy—two or more persons. It is therefore unnecessary to address the other elements.

The majority alternatively relies on the alter ego doctrine, citing *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1362 (10th Cir.1974), to establish that defendants could be considered coconspirators with the employee Jones. The majority is correct that Kansas has adopted the alter ego doctrine to pierce the corporate veil. However, the majority's application of that doctrine in the case at bar does not follow from the decisions of the Kansas courts. "[A] corporation and its stockholders are presumed separate and distinct, whether the corporation has many stockholders or only one." *Amoco Chemicals Corp. v. Bach*, 222 Kan. 589, 567 P.2d 1337, 1341 (1977). Single ownership of a corporation is insufficient in itself to pierce the corporate veil. *Id.* The power to disregard the corporate entity and apply the alter ego doctrine is to be "exercised reluctantly and cautiously." *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743, 751 (1983).

The Supreme Court of Kansas has enumerated eight factors "considered significant in justifying a disregard of the corporate entity." *Id.*, 665 P.2d at 751. They are:

(1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.

*Id.* (quoting *Amoco Chemical Corp. v. Bach*, 222 Kan. 589, 594, 567 P.2d 1337, 1341–42 (1977)).

In the case at bar only factors seven and eight might be applicable. To be applicable, however, the injustice to the parties must follow from the judicial acknowledgment of the corporate entity. *See Quarles v. Fuqua*, 504 F.2d 1358, 1362 (10th Cir. 1974). Neither the plaintiffs nor the majority have established how plaintiffs will be hurt if the corporate entity is recognized. There is no indication that plaintiffs will be unable to recover if the corporate veil is not pierced. The corporation has every appearance of being able to satisfy the judgment against it.

Furthermore, while each case must be decided on its specific facts, *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743, 751 (1983), the case at bar is dissimilar from the cases where Kansas has chosen to apply the doctrine. In recent years the Kansas Supreme Court has upheld a trial court's piercing of the corporate veil in only two cases. *Id.* One case dealt with a vertical series of corporations that were undercapitalized. In the other case the defendant corporation was found to be the conduit which the individual defendant used to conduct his personal business. In that case defendant "was the principal stockholder, officer and manager of the corporation; principal creditor; principal receiver of assets of the corporation; principal worker and principal transferee of all funds secured by the corporation." *Id.*

Conversely in the case at bar the corporation is over ten years old, has several hundred employees, and at the time in question had offices in Boston, Chicago, Miami, San Francisco and Newport Beach. In short, the corporation shows every sign of being an independent entity that is more than a mere instrumentality used to conduct defendants' business.

The majority cites to the fact that the individual defendants were the principal officers, and the only directors and shareholders.* As noted above, those facts are insufficient to pierce the corporate veil. The only other thing cited by the majority is that the individual defendants signed the consent decree as individuals rather than in their corporate capacity. That fact, however, provides no basis for piercing the corporate veil. Rare would be the small closely-held corporation that would not fit under the majority's analysis in this case.

Because I find that plaintiffs failed to establish a conspiracy and the alter ego doctrine is inapplicable in this case, the trial court's personal jurisdiction over the individual defendants is brought into question. The district court based its jurisdiction on Kansas' long arm statute. In particular, the commission of a tortious act within the state. The majority relies on the torts of "[f]raud and deceit in inducement to contract" to sustain the trial court's decision. Ante at 727.

The majority acknowledges that the individual defendants' only arguable contacts with Kansas were: "(1) execution of the 1976 Consent Decree, (2) in an affidavit, Don Schleicher stated that a form letter bearing his signature stamp was mailed to Louis Wegerer in Kansas, and (3) copies of investment recommendations generated by Richard Schleicher were mailed to the Wegerers in Kansas." Ante at 727. Those acts of themselves do not constitute the torts of fraud or deceit. Since I find no support in the record for the allegations of conspiracy, there is no evidence to support the allegations of fraud and deceit as to the individual defendants. Thus, I am compelled to conclude that there is no basis for jurisdiction over the individual defendants and the case should be dismissed as to them.

---

* The majority at times refers to the individual defendant as the only shareholders. At other times their opinion correctly reflects that the individual defendants sold 20 percent of the corporate stock to an employee stock ownership plan.