(971 P.2d 1204)
No. 79,208

CHERRYVALE GRAIN COMPANY, *Appellant*, v. FIRST STATE BANK
OF EDNA, *Appellee*.

Opin-
ion filed January 15, 1999.

*Daniel R. Ray*, of Spigarelli, McLane & Short, of Branson, Missouri, for the appellant.

*Martha A. Peterson*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., of Topeka, for the appellee.

Before LEWIS, P.J., ELLIOTT, J., and RICHARD B. WALKER, District Judge, assigned.

LEWIS, J.: Cherryvale Grain Company (CGC) operated a grain elevator in Cherryvale, Kansas. The Read family had owned and operated the business in Cherryvale and the vicinity thereof for over 35 years. At all times relevant to this lawsuit, John Read was president of CGC, having succeeded his father, Robert, in that position in 1988.

CGC conducted most of its banking business at the First State Bank of Edna (Bank). CGC sued the Bank for damages as a result of several notes which were accepted by the Bank even though they bore forged signatures. After consideration of various factors, CGC paid all the notes it owed to the Bank including the forged notes. In the litigation that followed, the trial court granted summary judgment in favor of the Bank and against CGC. CGC appeals from the grant of summary judgment in favor of the Bank.

One of the key players in this drama was Janice Ellis, who had worked at CGC as a bookkeeper for almost 20 years. The Read family placed its total and unsupervised trust in Ellis and, as near as we can determine, did not supervise or oversee her in any way. The trust the Read family reposed in Ellis proved to be totally misplaced.

Not only did Ellis apparently forge the instruments which form the basis of this lawsuit, there is also evidence of other misdeeds on her part.

On July 19, 1994, CGC borrowed $75,000 from the Bank. John Read acknowledges that his signature appears on the original note. The proceeds from the original note were deposited in CGC's general checking account and were presumably used in the operation of the business. On September 8, 1994, the $75,000 note was paid by renewal. On December 7, 1994, CGC paid the principal amount of $75,000, plus interest in full, and the note was retired. Sometime after making this payment, the Reads discovered that the renewed note for $75,000 was a forgery. The Reads seek damages from the Bank for its acceptance of the forged renewal. The trial court granted summary judgment to the Bank on this note because "[p]laintiff legitimately borrowed $75,000.00, which went into the business account and plaintiff paid back the same amount. No loss or damage occurred nor has any been proved, and therefore, sum-

mary judgment should be granted in regards to this additional claim . . . ."

On September 6, 1994, the Bank loaned CGC $50,000 on a note which bore the signature of "John E. Read." John Read denies that he signed the note in question. The note was renewed on December 7, 1994, again under the signature of "John E. Read." As with the original of this $50,000 note, John Read denies that his signature appears on the renewal note. The $50,000 in proceeds from this note was deposited in the CGC account. The fact that CGC's bank account was suddenly $50,000 richer is a fact which apparently was not noticed by the CGC ownership.

CGC also had a $10,000 line of credit with the Bank. On September 13, 1994, the Bank advanced to CGC $10,000 on the line of credit, and the funds were deposited in the CGC general business account. The $10,000 was paid out on a letter requesting this advancement and signed by "John E. Read." Again, after examining the signature, John Read denies that his signature appears on the letter in question.

For our purposes, we assume that the original $75,000 note bore the true signature of John Read and that the renewal of that note bore his forged signature. We also assume that the $50,000 note of September 6, 1994, was forged as was the renewal of that note. The letter requesting a $10,000 advance on the line of credit is also assumed forged.

The trial court granted summary judgment in favor of the Bank and against CGC for the following reasons: (a) The $75,000 note of July 19, 1994—CGC can show no damage from the forged renewal of this valid note. (b) The $50,000 of September 6, 1994, and $10,000 line of credit advanced to CGC on September 13, 1994, was voluntarily paid by CGC, and this act of payment ratified the forged signatures.

The appeal in this case is from the issuance of a grant of summary judgment. Our standard of review in such cases is well known:

"Appellate review of a district court's grant of summary judgment is governed by well-established rules. The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom

the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A defendant is entitled to summary judgment if the defendant can establish the absence of evidence necessary to support an essential element of the plaintiff's case. [Citations omitted.]

"When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citations omitted.] In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.

"To have evidentiary value, the particular document or testimony relied upon by the party opposing summary judgment must be probative of that party's position on a material issue of fact. [Citation omitted.] Probative evidence is that which 'furnishes, establishes or contributes toward proof.' [Citation omitted.] On appeal we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131-32, 955 P.2d 1189 (1998).

## $75,000 NOTE

The original of the $75,000 note bore the genuine signature of John Read, and the proceeds went into CGC's general bank account. It is true that the renewal of this note was forged, but that did not affect the validity of the note or the obligation of CGC to pay it back.

There is no issue on this note concerning ratification. Ratification is not a factor where the underlying obligation is binding and effective. No act of ratification was necessary to make this note binding as against CGC.

We agree with the trial court that no loss or damage resulted to CGC from the Bank's negligence in accepting a forged signature on the renewal note. The renewal did not change or modify CGC's obligation to repay the $75,000 in full with interest. CGC did as it was required to do; it repaid the note with interest. We are at a loss to understand how it could have been damaged by the Bank's negligence.

CGC argues that if the Bank had been vigilant and had recognized the forged renewal and advised CGC immediately, CGC could have taken steps to avoid further damage from the forgeries.

The problem with this argument is that CGC had at least an equal obligation to supervise its own employees and to protect itself from embezzlement and forgery. In our judgment, had the officers of CGC been as vigilant as they expect the Bank to have been, they would have discovered the embezzlement on their own and would have been able to protect CGC from such damages as they believe have been caused. CGC did not oversee its bookkeeper, and months went by before its officers looked at their note case and discovered forged instruments. We do not believe that CGC may close its eyes to what its own employee was doing and then blame the Bank on the theory that the Bank should have advised it that its bookkeeper was forging instruments.

We affirm the trial court's grant of the summary judgment on the $75,000 note on the premise that CGC has not been able to show and could show no damage.

## OTHER NOTES

The $50,000 of September 6, 1994, and the line of credit draw of $10,000 on September 13, 1994, present other issues. The instruments on which the note and line of credit were drawn were forgeries. As contrasted to the $75,000 note, in the case of this $60,000, the underlying obligation was not valid. It is true that the proceeds of these loans went into CGC's general business account. We doubt, however, whether that fact could have made the forged instruments themselves enforceable, but we do not need to decide that issue.

On March 17, 1995, CGC paid the Bank the total principal amount of these notes, amounting to $60,000. The Bank agreed to waive any accrued interest. We note that neither party argues that this payment or the waiver of interest constituted a settlement between the parties.

The trial court granted summary judgment in favor of the Bank on the $60,000 in obligations by deciding that CGC had ratified the forged instruments by a payment of the notes:

"Pursuant to the Uniform Commercial Code, specifically as adopted by the Kansas Legislature and embodied in K.S.A. 84-3-403(a), any unauthorized signature would not have been binding upon [CGC] unless the same was ratified.

Upon learning of the forgeries [CGC] was under an obligation to promptly repudiate the note and advance as being unauthorized or forgeries. Sometime between the 23rd and 25th of February [CGC] was aware that the signatures were not authentic. This fact was made know[n] to the Bank by the Reads on March 15, 1995, however, irrespective of this knowledge the plaintiff opted to make full payment upon the very obligations that they were under no obligation by law to pay. *Ratification of the unauthorized signatures clearly took place at the time of payment.* Plaintiff's claims of duress are not substantiated by the record. Additionally, plaintiff's claim that the payment of the notes by [CGC] was a form of repudiation is misplaced and erroneous." (Emphasis added.)

We reverse that determination and hold that a material question of fact remains on the issue of ratification and remand the matter for trial on that issue as to the $60,000 in obligations covered by this section of our opinion.

We would agree that at first glance it appears logical that the voluntary payment of a forged instrument, with knowledge of the forgery, would ratify the validity of the instrument. However logical that may appear to be, it is not strictly true.

Our research has not yielded any Kansas cases dealing with the issue of ratification by payment. However, we do have decisions defining ratification in other circumstances. In *Vanier v. Ponsoldt*, 251 Kan. 88, 106, 833 P.2d 949 (1992), the court, in dealing with a sales contract, said: "Ratification is established by the purchaser accepting the benefits of the contract or 'by a failure to act promptly to repudiate the transaction.'"

In a landlord-tenant dispute, the court in *Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, 117, 542 P.2d 297 (1975), said: "Ratification has been defined as the acceptance of the result of an act *with an intent to ratify*, and with full knowledge of all the material circumstances." (Emphasis added.)

In *Allison v. Borer*, 131 Kan. 699, 703, 293 Pac. 769 (1930), the court said: "'The acceptance and retention of the proceeds of a loan or of the benefits thereof, although made without authority, amount to an implied ratification of the loan . . . .'"

"Whether there has been ratification of a forged signature is usually a question of fact." *Cook v. Great Western Bank & Trust*, 141 Ariz. 80, 84, 685 P.2d 145 (Ct. App. 1984). See *Common Wealth Ins. Systems, Inc. v. Kersten*, 40 Cal. App. 3d 1014, 1025,

115 Cal. Rptr. 653 (1974); *Johnson v. North Bank*, 99 Ill. App. 3d 320, 323, 426 N.E.2d 4 (1981); *Orefice v. First National City Bank*, 37 App. Div. 2d 830, 325 N.Y.S. 2d 281 (1971). See generally Annot. 93 A.L.R.3d 967 (1979).

CGC paid off the $60,000 indebtedness that can be traced to the forged instruments. The question is whether that act was a ratification of the notes. If it was not a ratification, could it have been a repudiation? The answer appears clear that voluntarily retaining the benefits of a forged instrument amounts to a ratification of that instrument. CGC argues that it was simply attempting to repudiate the validity of the forged instruments by returning the $60,000 to the Bank.

The question, as we view it, is one of fact. The trier of fact must determine the intent of CGC when it paid off the debt of $60,000. Further, "[i]t is essential, however, that the act of adoption be truly voluntary in character. Moreover, there can be no adoption if the act, although voluntary, is done only because the purported principal is obligated to minimize his losses . . . because of duress . . . ." *Rakestraw v. Rodrigues*, 8 Cal. 3d 67, 73, 104 Cal. Rptr. 57, 500 P.2d 1401 (1972).

Intent of the contracting parties is a question of fact and may be shown by acts, circumstances, and inferences reasonably deducible therefrom and need not be established by direct evidence. *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, Syl. ¶ 6, 684 P.2d 1031 (1984). "Intent of the contracting parties is normally a question of fact for the jury . . . ." *Kastner v. Blue Cross & Blue Shield of Kansas, Inc.*, 21 Kan. App. 2d 16, 24, 894 P.2d 909, *rev. denied* 257 Kan. 1092 (1995).

"Even though much of plaintiffs' case finds its basis in such circumstantial evidence, the record must preclude summary judgment at this point. *A party's intent must usually be proven by circumstantial evidence, and summary judgment is rarely appropriate in such instances. 'A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties.'*" (Emphasis added.) *Marinhagen v. Boster, Inc.*, 17 Kan. App. 2d 532, 540, 840 P.2d 534 (1992), *rev. denied* 252 Kan. 1092 (1993).

See *Henrickson v. Drotts*, 219 Kan. 435, 438, 548 P.2d 465 (1976); *Stanfield v. Osborne Industries, Inc.*, 7 Kan. App. 2d 416, Syl. ¶ 8,

643 P.2d 1115, *aff'd in part and rev'd in part on other grounds,* 232 Kan. 197, 654 P.2d 917 (1982).

We conclude the trial court erred in granting summary judgment to the Bank on the issue of ratification. CGC asserts that its payment of $60,000 to the Bank was a repudiation of the forged instruments. If it is determined that CGC made the payment in order to avoid retaining the benefit of the forgeries, then that payment could not be considered a ratification.

CGC also argues that the $60,000 payment to the Bank was made under duress. It develops that the Bank had filed suit against CGC on the notes in question. CGC was aware of the lawsuit and realized that a lawsuit of this nature would block a pending proposed sale of the business. Therefore, in order to continue with its proposed sale of the business, CGC was forced to pay the notes in question. As we have pointed out above, in order for the payment to be an act of ratification, it must have been truly voluntary in character and must not have been made because of duress.

We conclude that the position of CGC is not unreasonable and that the intent with which it paid the debt in question must be determined on a trial of the merits. In the event it is determined that the payment was made under duress or with the intent to repudiate the forgery, then CGC would be entitled to prove damages if it can do so.

We remand the matter for trial on the question of ratification and particularly on the question of the intent of CGC in paying the forged notes.

## ATTORNEY-CLIENT PRIVILEGE

The trial court held that a conversation among John Read, his attorney, and his sister was not protected by the attorney-client privilege. In order to decide this issue, the trial court was furnished a letter from CGC's attorney. The trial court examined the letter *in camera,* and that letter is not part of the record on appeal. We acknowledge that a copy of that letter was appended to the brief of CGC. We point out that material included in an appendix of an appellate brief is not a substitute for the record on appeal. See

*Cline v. Tittel*, 20 Kan. App. 2d 695, 702-03, 891 P.2d 1137, *rev. denied* 257 Kan. 1091 (1995).

In any event, if a client chooses to make or receive communications to or from a lawyer in the presence of a third person, that communication ceases to be confidential. *Hutton v. Hutton*, 184 Kan. 560, 565, 337 P.2d 635 (1959). In *Hutton*, the presence of family members when a man consulted his lawyer caused the attorney-client privilege to be waived. 184 Kan. at 565. See *State v. Maxwell*, 10 Kan. App. 2d 62, 65, 691 P.2d 1316 (1984), *rev. denied* 236 Kan. 876 (1985).

It is apparent that Karen Connor, a sister of John Read, was neither an officer nor director nor had an ownership interest in CGC. Her presence at the meeting in question resulted in the communications not being protected by the attorney-client privilege.

## MOTIONS TO AMEND

CGC filed two motions to amend its petition. The trial court denied both of those motions, and the denial is appealed by CGC. It has been nearly 1½ years since this case was appealed. Due to the passage of time, we do not believe the trial court should be bound by its previous ruling on procedural matters.

For that reason, we declare the present ruling of the trial court on CGC's motions to amend to be null and void and of no further effect. On remand, the trial court should rule anew on all procedural issues. We comment, however, that a motion to amend should not be denied without good cause being stated by the trial court.

Affirmed in part, reversed in part, and remanded with directions.