No. 94,766

ARTHUR NEIL WARNER, INDIVIDUALLY; and ARTHUR NEIL WARNER FOR AND ON BEHALF OF ALL OF THE SURVIVING HEIRS OF PATRICIA ANN WARNER, DECEASED, *Appellants,* v. ROBERT HARRY STOVER; CANAL INSURANCE COMPANY; and FARM BUREAU MUTUAL INSURANCE COMPANY, *Appellees.*

(153 P.3d 1245)

Review of the judgment of the Court of Appeals in an unpublished decision filed June 30, 2006. Opinion filed March 16, 2007.

*Gary E. Laughlin,* of Hamilton, Laughlin, Barker, Johnson & Watson, of Topeka, argued the cause, and *David E. Watson,* of the same firm, was with him on the briefs for appellant.

*Douglas N. Ghertner* of Slagle, Bernard & Gorman, P.C., of Kansas City, Missouri, argued the cause, and *Jack D. McInnes V,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

NUSS, J.: This is a personal injury and wrongful death action arising out of a pickup truck rollover. The district court held that the pickup was personally owned by the driver's son and therefore not covered by the son's corporation's insurance policy issued by Canal Insurance Company (Canal). As a result, the court granted Canal's motion for summary judgment against plaintiff Warner. The Court of Appeals affirmed in *Warner v. Stover*, No. 94,766, unpublished decision filed June 30, 2006. We granted Warner's petition for review pursuant to K.S.A. 20-3018(b).

The sole issue on appeal is whether the district court erred in granting summary judgment to Canal. We hold that the court so erred; we reverse and remand.

## FACTS

On December 25, 2002, Arthur Neil Warner (Warner), his wife Patricia Ann Warner, and Vivian Dunn were passengers in a 2002 Ford F250 pickup truck driven by Robert Harry Stover (Robert). When the pickup was just east of Dalhart, Texas, it hit a patch of ice, slid into a ditch, and rolled twice. Patricia Warner was killed, and Warner suffered injuries.

The pickup's certificate of title and registration listed only Robert's son, Charles Stover (Stover). Farmers Insurance Company (Farmers) provided insurance coverage for the pickup, the only vehicle insured under the Farmers policy. The policy's named insured was Stover. Stover reported the accident to Farmers, which eventually paid its policy limits of $25,000 to Warner for his injuries and $25,000 for his wife's wrongful death.

Stover is also the president and owner of Western Liquid Express, Inc. (Western), of Topeka. Western's trucks transport building materials, farm machinery, and parts. Western's vehicles are covered by insurance with Canal Insurance Company in the amount of $1,000,000 per occurrence.

Warner, individually and on behalf of the surviving heirs of his deceased wife, filed an action against Robert and Canal for his personal injury and her wrongful death. Canal was allegedly a proper party pursuant to K.S.A. 66-1,128 and case law interpretations of the statute. Warner alleged, among other things, that

Canal insured Western's vehicles and that Western's policy insured the pickup at the time of the accident. As partial support, Warner alleged that the pickup was being operated pursuant to a Kansas Corporation Commission (KCC) permit issued to Western.

At the close of discovery the district court eventually granted Canal's motion for summary judgment. The court concluded that Canal's insurance policy only provided coverage for vehicles owned by Western, that the truck was "owned and titled" to Stover personally, and that consequently no Canal coverage existed.

The district court later denied Warner's motion for reconsideration, again specifically addressing the ownership issue: "The bottom line, in the Court's view, is that ownership of the vehicle controls the coverage question and vehicle ownership in Kansas is controlled by title and registration. In the case at bar, that is with the individual defendant alone."

Trial proceeded against Robert and judgment was entered against him in the amount of $607,990.80. On June 30, 2006, our Court of Appeals affirmed the district court's summary judgment.

## ANALYSIS

Issue: *The district court erred in granting summary judgment to Canal because genuine issues of material fact existed.*

Warner argues that the district court, as affirmed by the Court of Appeals, relied upon disputed material facts in granting summary judgment. Canal vigorously denies any genuine issue of material facts.

Our standard for reviewing summary judgments is well-known:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and *where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be*

*denied."* [Citations omitted.]' " (Emphasis added.) *State ex rel. Stovall v. Reliance Ins. Co.,* 278 Kan. 777, 788, 107 P.3d 1219 (2005).

As summarized by the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252, 91 L. Ed 2d 202, 106 S. Ct. 2505 (1986), in this case we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

We continue our analysis by examining the language of the Canal insurance policy. The interpretation is a question of law which we make de novo. *Exploration Place, Inc. v. Midwest Drywall Co.,* 277 Kan. 898, 89 P.3d 536 (2004). In that examination, if the policy language is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used. *Marshall v. Kansas Med. Mut. Ins. Co.,* 276 Kan. 97, 111, 73 P.3d 120 (2003).

According to Section A.I of the insurance policy, Canal agreed:

"The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

**bodily injury or property damage**

to which this insurance applies, caused by an **occurrence** and arising out of the ownership, maintenance or use, including loading and unloading, for the purposes stated as applicable thereto in the declarations, of an **owned automobile** or of a **temporary substitute automobile** . . . ."

Section A.III of the policy defined "insured" as the named insured or any other person while using an owned automobile with the permission of the named insured.

Section A. VII defined "**Owned automobile**" as "(a) an **automobile** which is owned by the **named insured** and described in the declarations; or (b) an **automobile** ownership of which is newly acquired by the **named insured** during the policy period."

Under the plain language of the policy, the named insured is Western; Robert initially qualifies as an insured because indisputably he was using the pickup with the permission of Western. The question remains whether Robert was using a Western "owned automobile." While under the plain language of the policy the district court was correct in holding that "ownership" was important

to the coverage issue, we conclude the court was incorrect in holding that "title and registration" is dispositive of the ownership question and in holding that Stover, personally and absolutely, owned the "owned automobile." As we stated in *Weaver v. Hartford Fire Ins. Co.*, 168 Kan. 80, 84, 211 P.2d 113 (1949): "A person may actually own an automobile and thus have an insurable interest in it and yet not have legal evidence of title."

More specific guidance on ownership is contained in *Tyler v. Employers Mut. Cas. Co.*, 274 Kan. 227, 49 P.3d 511 (2002). There, while driving a patrol car, a Jefferson County deputy sheriff collided with an uninsured driver. The deputy brought an action against the county's automobile insurance carrier to recover uninsured motorist benefits. The insurance carrier argued that its named insured, "Jefferson County, Kansas," did not actually own the patrol car because the title listed "Jefferson County Sheriff Dept." as the owner. 274 Kan. at 234. Despite the carrier's assertion that "ownership and legal title are presumed to be one and the same concept in defining the scope of insurance coverage" (274 Kan. at 234) and despite the sheriff's department's listing on the title, the *Tyler* court concluded that the county's insurance policy provided coverage, citing *Weaver v. Hartford Fire Ins. Co.*, 168 Kan. 80.

The Court of Appeals distinguished *Tyler* by noting that there the patrol car was actually listed in the county's policy as a "covered vehicle." By contrast, the Canal policy did not specifically list the pickup as a covered automobile. Slip op. at 6. We find this distinction to be potentially relevant to a trier of fact on the issue of ownership, but not dispositive on that issue in a motion for summary judgment. An endorsement to the Canal policy, Form MCS-90, specifically addresses the impact of a vehicle's nonlisting, providing in relevant part:

"In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility of requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 *regardless of whether or not each vehicle is*

*specifically described in the policy* and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." (Emphasis added.)

We acknowledge a substantial amount of evidence suggests Stover's personal ownership of the pickup. Farmers insured the pickup, and only the pickup, under a policy showing Stover as the named insured. The accident report shows only Farmers as the pickup's insurance carrier. Stover reported the accident to Farmers which paid its policy limits. The certificate of title shows Stover's name, not Western's; indeed, Stover testified that he owned the pickup. He also testified that the pickup was not used in Western's business and that the day of the accident, the pickup was being used for personal business—transporting people to a K-State football bowl game.

While the certificate of title shows Western's address, Stover testified that he often used Western's address as his own. Additionally, the named insured on the Canal policy is Western Liquid Express, Inc., and the pickup was not identified on the policy's schedule of equipment.

On the other hand, when resolving all facts and inferences which may reasonably be drawn from the evidence in favor of Warner, evidence suggesting Western's ownership of the pickup is sufficient to prevent us from declaring that the evidence is so one-sided that Canal must prevail as a matter of law. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251.

The transfer of title from Foster Ford-Mercury as the pickup dealer to the purchaser, Charles Stover, in October 2001 listed Western's address, ·not Stover's. The later accident report shows the pickup owner as "Charles Stover Western Liquid Express," and lists Western's address. Farmer's policy, while specific to the pickup, also showed Western's address.

Additionally, in November 2001, Stover applied for a "title-apportioned registration" for the pickup with the Kansas Department of Revenue. While he listed his personal address, Western's Carrier Account Number and its MC number with the KCC appear on the application. Because Stover testified that had previously obtained such prorate license tags on 8-10 of his personal vehicles through-

out the years in order to save sales tax, a reasonable jury could find that this particular application was not by mistake.

The following month, December 2001, Western faxed its "truck list" to the KCC as Western's 2002 request for KCC authorization and cab cards for the listed vehicles. See K.S.A. 66-1,139. Included among Western's 23 vehicles was the pickup. In early January 2002, the KCC faxed a responsive "cab card" letter to Western listing Western's 23 vehicles which were KCC-authorized to operate in 2002; the pickup was included. In a later affidavit to the district court, Stover characterized Western's listing of the pickup with the KCC as a Western mistake. He attached a copy of a faxed reply sent within 30 minutes of his receipt of the KCC fax, asking for a vehicle to be deleted from Western's list and another one to be added. While his affidavit states the pickup was to be deleted and a Mack truck to be added, his fax shows the word "delete" with an arrow apparently pointing to a 1984 Mack truck; the accident pickup is circled.

According to a KCC affidavit attached to Warner's motion for reconsideration, the KCC instead deleted the 1984 Mack truck and added a different Mack truck "[p]ursuant to the instructions from Western" in the fax. The affiant, the KCC's Kathy Swank, declares that the pickup remained on the KCC-authorized list because Western's fax "did not deal with the [pickup] nor did it contain any instructions relating to the [pickup]."

Swank's affidavit also revealed she had reviewed Western's files which disclosed that as of the date of the accident, the pickup was still listed as an authorized vehicle under Western's KCC authority; that as of the date of the accident, the insurance company listed with the KCC for Western was Canal; and that the official truck list filed by Western (in December 2001 for the year 2002) shows that Western owned the pickup and that it should be included as an authorized vehicle under the KCC authority for Western.

We acknowledge Stover alleges that his January 2002 fax was his attempt to correct Western's mistake and to have the pickup deleted from Western's list of KCC-authorized vehicles. Nevertheless, Swank's affidavit also discloses that the renewal truck list filed by Western for 2003—received by the KCC on December 30,

2002, 11 months after Stover's correcting fax—still listed the pickup as one owned by Western that should be listed under Western's KCC authority for 2003. Because there apparently was no testimony regarding the intent behind this latter listing of the pickup, Canal speculated during oral arguments that this was yet another Western mistake. However, it also candidly acknowledged that the listing possibly could instead be viewed as a ratification of the earlier Western "mistake." Ratification is a question of fact. *Cf. Cherryville Grain Co. v. First State Bank of Edna,* 25 Kan. App. 2d 825, 830, 971 P.2d 1204 (1999); see also *Romero v. Bank of the Southwest,* 135 N. M. 1, 6, 83 P.3d 288 (2003) (ratification is best reviewed as an issue of fact). As a result, the Court of Appeals' conclusion that the pickup "once had been mistakenly listed with the KCC as a business vehicle," is a factual determination based on conflicting evidence that should not be made when reviewing a summary judgment. Slip op. at 7.

Swank's affidavit also revealed that the pickup was not deleted from the KCC list of authorized vehicles until December 29, 2003, when the KCC received the pickup-less 2004 renewal list from Western. Indeed, the record on appeal contains a copy of an internet motor carrier search in March 2003 for Western that listed the pickup as one of the vehicles under Western's KCC permit for 2003. Consequently, as Swank's affidavit declares, at the time of the accident in 2002, the pickup was still operating under a pro-rated license issued under Western's KCC motor carrier identification number.

Canal objected to the Swank affidavit at the district court level, particularly because of its alleged untimeliness. During oral arguments, however, it conceded that this court could consider it on appeal. Moreover, while a Canal representative testified that Canal was unaware that the pickup had ever been listed with the KCC as a business vehicle or that it operated pursuant to a Kansas pro-rate tag, this testimony merely demonstrates that genuine issues of material fact clearly exist on the subject of the pickup's ownership.

Canal also argues as an apparent fallback position that no genuine material issue of fact remains on the subject of whether the pickup was actually used in Western's business. In particular, Canal

argues: "In order to effect the provisions and a claim under this direct action statute [K.S.A. 66-1,128], Warner was required to prove that Stover was operating the Ford F-250 vehicle as a motor carrier *in the business of Western Liquid Express, Inc.,* at the time of the accident. *Sterling v. Hartenstein,* 185 Kan. 50, 341 P.2d 90 (1959)." (Emphasis added.) Canal points to the uncontroverted testimony of Robert and Stover about the lack of business use, argues that consequently no insurance coverage can possibly be found, and concludes that summary judgment is therefore proper.

We begin by observing that no "business use" requirement appears in Canal's policy. It plainly provides:

"The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
**bodily injury or property damage**
to which this insurance applies, caused by an **occurrence** and arising out of the ownership, maintenance, or *use . . . of an owned automobile."* (Emphasis added.)

As for reliance upon *Sterling,* Canal's assertion is an overreading of that case, as the following background demonstrates. Under K.S.A. 66-1,128, a motor carrier of property such as Western must file with the KCC a KCC-approved liability insurance policy, or else certification of such insurance, before being able to obtain an operational certificate, permit, or license from the KCC. A plaintiff's ability—based upon K.S.A. 66-1,128—to bring a direct action against an insurance company before judgment is rendered against its insured motor carrier had been judicially created in *Dunn v. Jones,* 143 Kan. 218, 53 P.2d 918 (1936). Nineteen years later in *Johnson v. Killion,* 178 Kan. 154, 283 P.2d 433 (1955), as the *Sterling* court itself observed, this court addressed the situation where the KCC had issued the permit and insurance had been obtained, but the policy had not been filed with the KCC. This court nevertheless held that a direct action could be brought against the defendant insurance carrier.

The *Sterling* case 4 years later addressed a deficiency in addition to the one described in *Johnson*: The motor carrier was not only without a permit or license from the KCC, but its insurance policy also had not been filed there. The trial court dismissed the insur-

ance carrier as a defendant, holding it was not a proper party under K.S.A. 66-1,128. In reversing and remanding, this court said:

"[A]n insurance carrier furnishing liability insurance to a motor carrier may be joined with such motor carrier as a party defendant and held directly liable to a plaintiff injured by the negligent operation of a motor carrier on the highways of this state, *even though such motor carrier does not have a permit or license from the State Corporation Commission under the Public Motor Carrier Act,* where:

"1. The motor carrier was required under the Public Motor Carrier Act of this state to have a license,

"2. The policy of insurance issued the motor carrier was a liability insurance policy of the type required of a licensed motor carrier in the State by G.S. 1957 Supp., 66-1,128, and

"3. *The motor carrier was at the time of the accident being operated on the highways of this state in the business for which a license or permit was required,* and in contemplation of which the insurance policy was issued by the insurance carrier for compliance with the Public Motor Carrier Act." (Emphasis added.) 185 Kan. at 59.

The *Sterling* court's ruling was in direct response to the plaintiff's petition alleging that the truck was being used in the defendant's dairy business at the time of the accident. The court merely reinstated the direct action against the insurance carrier and ordered that a copy of the insurance carrier's policy be produced to the plaintiff. In short, the court simply did not reach Canal's issue: whether business use was a requirement for insurance coverage.

Canal's argument also is inconsistent with the public protection principle contained in the motor carrier statutes. See K.S.A. 66-1,128 (No operating permit shall be issued to a motor carrier unless and until applicant has filed with the KCC a liability insurance policy which adequately protects the interest of the public.). See also K.S.A. 66-1,126 (person who operates as a carrier without first obtaining a certificate, permit, or license shall be guilty of a misdemeanor). We have interpreted K.S.A. 66-1,128 to expand a plaintiff's rights to proceed directly against a motor carrier's insurance company. See *Kirtland v. Tri-State Insurance Co.,* 220 Kan. 631, 556 P.2d 199 (1976). We will not, however, judicially constrict a plaintiff's insurance contract-based ability to recover under such a policy. *Cf. Farm Bureau v. Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.,* 248 Kan. 657, 659-60, 810 P.2d 283 (1991) ("When an insur-

ance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made.").

While we reject Canal's argument that lack of business use is dispositive of the issue of insurance coverage, we acknowledge that evidence of business use—or lack thereof—can be relevant to the issue of pickup ownership and may be considered for that reason by the trier of fact on remand.

In our view, summary judgment was granted prematurely. We invite the parties to more fully develop and clarify the legal theories and defenses which they believe may control this case including, but not limited to, those that may be suggested by policy endorsement Form MCS-90. We further invite the parties to clearly notify the district court of the same.

The judgment of the Court of Appeals affirming the district court is reversed. The judgment of the district court is reversed, and the case is remanded to that court for further proceedings.

LUCKERT and JOHNSON, JJ., not participating.

LARSON, S.J., assigned.

LOCKETT, J., Retired, assigned.[2]

---

[2] Justice Tyler C. Lockett, Retired, was appointed to hear case No. 94,766 vice Justice Johnson pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.